[Cite as *State v. Marcum*, 2011-Ohio-6140.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 10 CO 17 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| J.C. JOHN MARCUM | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Columbiana County, Ohio
Case No. 09 CR 287

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Robert Herron
Columbiana County Prosecutor
Atty. John E. Gamble
Assistant Prosecuting Attorney
105 South Market Street
Lisbon, Ohio 44432

For Defendant-Appellant: Atty. Dominic A. Frank
16233 Saint Clair Avenue
East Liverpool, Ohio 43920

JUDGES:

Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated:  November 21, 2011

WAITE, P.J.

{1}     Appellant, J.C. John Marcum, appeals the decision of the Columbiana County Court of Common Pleas to convict him on one count of assault on a peace officer and one count of aggravated burglary.  On the evening of December 9, 2009, after listening to a telephone message terminating his wife's employment, Appellant threatened his wife's former employer via telephone.  Appellant then went to his wife's former place of work.  He forcibly entered the building and physically confronted his wife's former employer.  There, he threatened both she and her daughter, also an employee, before striking a police officer in the face while resisting arrest.  Appellant was found guilty on both counts in the indictment.  Appellant was sentenced to fourteen months in prison for the assault and nine years in prison for the aggravated burglary, sentences to be served consecutively.

{2}     In his first and second assignments of error Appellant challenges both the sufficiency and the weight of the evidence against him.  At trial, the factfinder had ample evidence and testimony to consider on each element of the offenses charged.  The only facts genuinely at issue were thoroughly addressed by the cohesive testimony of six state witnesses.  It appears from the record that Appellant's first and second assignments of error are without merit.

{3}     In his third assignment of error, Appellant claims that the trial court improperly allowed certain testimony, which he characterizes as both hearsay

testimony, in violation of Evid.R. 801(C) and character evidence, in violation of Evid.R. 404(B). The testimony identified by Appellant does not fall within the scope of the rules cited. The testimony was relevant and offered for a proper purpose, and was therefore within the court's discretion to allow. Appellant's third assignment of error is without merit.

{4} In Appellant's fourth assignment of error he alleges prosecutorial misconduct. While statements made by the prosecutor at various points during the trial and in closing did not always rise to an ideal standard of professional discipline and decorum, nevertheless, the alleged instances of misconduct were neither so egregious nor so pervasive that they operated to prejudice Appellant's substantive rights or impinge upon the fairness of his trial. Appellant's fourth assignment of error is also without merit. For the following reasons, we affirm the judgment of the trial court in full.

## History of the Case

{5} On December 9, 2009 Appellant verbally threatened and physically confronted his wife's former employer, Rachel Altman, before striking a police officer, Michael Abraham, in the face while resisting arrest. The incidents occurred between approximately 9:30 and 10:00 in the evening in the Village of Lisbon, Ohio. Earlier that day Appellant's wife was fired from her job by Ms. Altman. According to Ms. Altman's testimony, Appellant cursed at her, threatened her, forced his way into Allay Senior Care, an assisted living facility Ms. Altman owns, where he physically

confronted her, and threatened her daughter, before breaking the glass out of the back door of the facility on his way out.

{6} According to the testimony of Ms. Altman, Appellant's wife Heather Marcum was the manager of Allay Senior Care, and had been employed at the facility for "[a]bout a year and a half." (Tr. Vol. I, p. 151.) Ms. Altman testified that Mrs. Marcum, in her capacity as manager, was responsible for ensuring that all shifts were covered and fully staffed. (Tr. Vol. I, pp. 151-153.) On December 9, 2009, during the afternoon there was a call-off. Ms. Altman's daughter, Lindsey Jester, made several unsuccessful attempts during her 2 p.m. to 6 p.m. shift to contact Appellant's wife so that the shift would be filled. (Tr. Vol. I, pp. 195-197.) Ms. Jester eventually reached Appellant instead, who told her his wife was "in bed" and that they "[will] have to figure something out." (Tr. Vol. I, p. 201.)

{7} When Ms. Altman learned that Appellant's wife failed to make arrangements for the shift, she decided it was time to "part our ways." (Tr. Vol. I, p. 155.) Ms. Altman testified that Mrs. Marcum's failure to "pull" call offs was an ongoing problem and she had discussed it with Mrs. Marcum on Monday of that same week. (Tr. Vol. I, pp. 155-156, 158.) Ms. Altman called Mrs. Marcum, but there was no answer, so she left a message on the answering machine, explaining: "'This is Rachel Altman from Allay Senior Care. We had the conversation on Monday, um, this should come to no surprise to you. We're gonna go ahead and part our ways. However the check is tomorrow * * * I can either A) send it to you. Or I can walk it across the street to you. You let me know what's more convenient for you. I wish

you a lot of luck. If you have any questions about this termination you can call me at any time on my cell phone, but please do not come over to Allay, or do not bother any of my employees or residents. Thank you.'" (Tr. Vol. I, pp. 158-159.)

**{8}** Ms. Altman testified that shortly after she left the message, the facility's caller identification showed a call from the Marcums' number. She answered the call and identified herself. (Tr. Vol. I, p. 160.) Appellant was on the line and asked, "'[w]hat's going on?'" Ms. Altman testified that she replied, "Heather was terminated this evening. If she has any questions she can call me. This is between her and I." Appellant responded with a verbal tirade: "'You're a f* * * bitch. How could you do this to my f* * * wife, you stupid ass bitch? I can't believe that you did this. She's the best employee you ever had, you stupid f* * *. You want me to come over there and beat your f* * * ass?'" (Tr. Vol. I, p. 160.) Ms. Altman testified that Appellant hung up the phone at this point. (Tr. Vol. I, pp. 160-161.)

**{9}** Ms. Altman decided to phone the Lisbon Police Department. Ms. Altman told the dispatcher "I just got a phone call and it was my manager that I just terminated's [sic] husband, threatening me over the phone. And I'm just telling you that because I think maybe I need to start a record of it." (Tr. Vol. I, pp. 161-162.)

**{10}** At this time the second line to the office rang. Caller identification again showed the Marcums' number, and Ms. Altman, as instructed by the dispatcher, picked up the second line while keeping the dispatcher on the first line. When Ms. Altman answered, Appellant continued his tirade, this time on speaker phone: "You stupid f* * * bitch, I'm gonna f* * * come over there and kick your ass you stupid f* * *

bitch. Who the f* * * do you think you are? You stupid f* * *. I'm gonna come over there and beat your f* * * ass. I want my wife's check right now. You're gonna make out my wife's check, and you're gonna f* * * given [sic] it to me, you stupid f* * *." At this point Appellant again hung up the phone. (Tr. Vol. I, p. 163.) Leasa Gray, the dispatcher, testified to hearing a male voice "screaming," "being loud," and saying "he was coming to get the f-ing check." (Tr. Vol. I, pp. 131-132.)

{11} Ms. Altman was now concerned both for the safety of both herself and the residents of the facility. She instructed her daughter to go upstairs, close the fire door, and ensure that all residents were in their rooms with the doors closed. She was told by the dispatcher that she needed to stay on the line until the police arrived. She dropped the phone in the office, ran up the stairs to the ground floor and picked up the phone on the same line in the kitchen/hall area. When she reached the kitchen/hall area and picked up the phone, she turned to the window to look out: "he [Appellant] was out [sic] the door, and he had a hold of the door knob, and he was looking in that window, and he just pop... I heard the door go, pop, and in he was." (Tr. Vol. I, p. 166.)

{12} When Appellant entered Allay Senior Care he continued to curse at the top of his lungs. According to Ms. Altman's testimony, during the exchange in the kitchen/hallway Appellant initially had his arms crossed over his chest and physically bumped into her, as she was blocking his way further into the room, while cursing and demanding his wife's check. (Tr. Vol. I, pp. 166-168; see also, Tr. Vol. I, pp. 211, 213.) After Ms. Altman lost her balance backing away from Appellant, she "came

back up, I think too fast, * * * and I came up too close, and that's when he just put his hands down and said, 'What?  What you are [sic] gonna do?  Are you gonna * * * hit me you stupid f* * * bitch?  Are you gonna hit me now?  F* * * hit me, I'll f* * * kill you you stupid f* * * bitch.'" (Tr. Vol. I, p. 168; see also, Tr. Vol. I, p. 212.)

{13}  Appellant then turned his attention to Ms. Altman's daughter, Lindsey Jester, who had come down to the kitchen area after assisting the residents to their rooms. (Tr. Vol. I, pp. 209-211.)  Appellant addressed Ms. Jester over Ms. Altman's shoulder and continued his expletive-filled diatribe, complaining that Ms. Jeter was the cause of his wife's dismissal.  (Tr. Vol. I, p. 169; see also Tr. Vol. I, p. 213.)  Ms. Altman instructed her daughter to leave, to which Ms. Altman testified Appellant responded "'I'll f* * * get you.  I will f* * * get you you stupid bitch.'"

{14}  Ms. Altman testified that throughout the exchange she repeatedly told Appellant to leave, saying: "You're not allowed to be here.  This is my house.  You're not allowed to be here.  You need to leave.  You need to leave now." (Tr. Vol. I, p. 169.)  Finally, after Ms. Jester moved out of Appellant's line of sight into the next room, Appellant continued to curse Ms. Altman, repeated his demands for his wife's check and concluded his vulgarity-filled visit with:  "'You haven't seen the last of me * * *.'"  Appellant then left through the same door by which he entered; this time with enough force to break the window glass out of the door.  (Tr. Vol. I, p. 170; also, Tr. Vol. I, p. 214.)

{15}  Earlier, when the second call came through and Appellant announced he was heading to the facility, the dispatcher sent officers on duty to Allay Senior

Care. After dispatching the officers, the dispatcher remained on the line with Ms. Altman, who was moving to the first floor at the facility. Ms. Gray, the dispatcher, testified that Ms. Altman told her "'[h]e's at the door.'" (Tr. Vol. I, p. 133.) She then heard a male voice say he was "there for the f-ing check. He was gonna get the f-ing check" and she heard Ms. Altman say "'[y]ou're trespassing, you need to leave.'" (Tr. Vol. I, pp. 133, 135.) At this point the dispatcher relayed the information she had to Lieutenant Carlisle who, having arrived at the facility, was seeking confirmation of Appellant's location. Ms. Gray advised the lieutenant that Appellant was present at the business at that time. (Tr. Vol. I, p. 136.) The log reflects that the dispatcher eventually heard glass break.

{16} At the same time, Patrolman Michael Abraham, who was approaching the edge of the building, heard a door slam and glass break. (Tr. Vol. I, p. 266.) Patrolman Abraham saw a man in a leather coat walking toward him and ordered the man to stop. (Tr. Vol. I, p. 266.) The man, later identified as Appellant, complied with the officer's instruction to stop and replied that he was "very, quote, 'Pissed off.'" (Tr. Vol. I, p. 267.) Patrolman Abraham then informed Appellant that he was under arrest and instructed Appellant to place his hands behind his back; Appellant complied. (Tr. Vol. I, p. 267.) However, when Patrolman Abraham approached Appellant to place handcuffs on his wrists, Appellant announced: "'[g]o ahead, you can arrest me, this ain't my f* * * first rodeo,'" and resisted the handcuffing posture by moving his right arm out from behind his back. (Tr. Vol. I, p. 267.)

**{17}** In response to Appellant's resistant posture, Patrolman Abraham moved Appellant toward the rear of a nearby car in an attempt to maintain control of him. When Patrolman Abraham placed Appellant on the rear portion of the vehicle, Appellant pushed back against the patrolman, raised his elbow and struck the patrolman in the left eye. (Tr. Vol. I, p. 267.) According to Patrolman Abraham's testimony: "my vision had blurred. So I went a little lower because I didn't want to catch another elbow or another fist, so I went a little lower on his stomach area and tried to get him down to the ground. We tussled a little bit in the parking lot." (Tr. Vol. I, p. 269.) At this point, Officer Reynolds joined Patrolman Abraham and struggled to bring Appellant to the ground. (Tr. Vol. I, pp. 243-245.)

**{18}** Lieutenant Carlisle approached the three with a taser and instructed Officer Reynolds to let go of Appellant. Once Lieutenant Carlisle was involved Patrolman Abraham heard Appellant say "'[d]on't taze me, I'm done.'" (Tr. Vol. I, p. 269.) Patrolman Abraham was able to bring Appellant to the ground, on his back, and after repeated commands to roll over and not resist, the three officers were able to take Appellant into custody. (Tr. Vol. I, pp. 245-248, 266-270.)

**{19}** Once Appellant was in custody he was taken to the Lisbon Police Department. While in custody Appellant's behavior was erratic. Patrolman Abraham explained: "At one time he was trying to befriend me. Another time, you know, he was telling me to take the cuffs off and that he would, you know, quote, 'Beat my ass, and that he was going to get me.'" (Tr. Vol. I, p. 270.) According to Patrolman Abraham's testimony Appellant's erratic behavior began during transport and "as we

were placing him in the car, you know, he was still throwing verbal threats at me. You know, stating that if he ever got out that he'd find me, and he'd settle this when he got out." (Tr. Vol. I, p. 271.) At one point Appellant was examined by K.L.G. Ambulance staff, who said they would transport him to the hospital for additional evaluation due to his professed trouble urinating. (Tr. Vol. I, pp. 270-271.) Appellant, whose complaints had resulted in the examination, refused treatment. Officer Reynolds also described Appellant's behavior based on what he overheard while Appellant was in the interview room: "He told Patrolman Abraham that he wasn't um, he wasn't very tough without his - - his * * * badge that he wouldn't be what he is" and "[o]ne minute he was stating, 'Take off your badge mother * * *.' And the next minute he was, you know, very peaceful and very calm." (Tr. Vol. I, pp. 249-250.)

{20} Appellant testified at trial that his behavior toward the law enforcement was "belligerent" and "pretty much intolerable" however, he maintained that although he was upset when being cuffed, if he came in contact with Patrolman Abraham "I didn't know anything like that [the contact] until I got my charges the next day." (Tr. Vol. II, pp. 351, 354-357.) Appellant maintained throughout his testimony that although he used profanity and obscenities, he never threatened Ms. Altman. Appellant explains that when he called Ms. Altman he told her he was coming to pick up his wife's check, even though he had been told no paychecks were yet prepared. He admitted he told Ms Altman she was "lying" about the check's availability. (Tr. Vol. II, p. 347.) Thus, although Appellant testified that he was told there was no check available that night, he explains his decision to enter the facility as an attempt

to pick up the check. Appellant claimed: "I was upset. I was very upset. I thought it was unfair, it was unprofessional. I felt that there was no absolutely no cause for that, other than she was upset because she had to cover that shift." (Tr. Vol. II, pp. 346-347.) Appellant testified that he had called Ms. Altman back to let her know he was coming for the check. Once he arrived, he found that the kitchen door to the facility was partially open, but the screen door was closed and unlocked. He testified that he opened the screen door, placed one foot in the kitchen while the other stayed outside the house. (Tr. Vol. II, pp. 347-348.) Then he "had a hold of the door handle. She was on the phone-- Rachel [Ms. Altman] was on the phone" and when he demanded the check she said "you need to leave" he said "'You know what, you're right, I will leave. You're a f* * * c* * *'" and that he slammed the door, breaking the glass, as he left. (Tr. Vol. II, p. 349.)

## Procedural History

{21} Appellant was indicted on January 29, 2010. Count one of the indictment charged Appellant with assault on a peace officer, R.C. 2903.13(C)(3), a fourth degree felony. Count two was for aggravated burglary, R.C. 2911.11 (A)(1), a first degree felony. A jury trial was conducted on May 3rd and 4th, 2010. Leasa Gray, the police dispatcher; Patrolman Abraham; Officer Reynolds; Rachel Altman, the owner of Allay Senior Care; Lindsey Jester, an employee of the facility and Ms. Altman's daughter; and Gail Richards, a resident of the building and volunteer for Allay Senior Care, all testified for the state. Appellant, and his wife, Heather Marcum, testified for the defense.

**{22}** The defense moved for a directed verdict of acquittal on both counts at the conclusion of the state's case-in-chief. The motion was overruled.

**{23}** A guilty verdict on each count was returned by the jury on May 4, 2010. Appellant was sentenced and judgment entered on May 5, 2010. Appellant received fourteen (14) months of incarceration on the assault charge and nine (9) years on the aggravated burglary charge, to be served consecutively, as well as five years of post release control and post-incarceration liability for the cost of the action. Appellant was given credit for one hundred forty-seven (147) days served. Appellant filed his timely appeal on May 14, 2010.

ASSIGNMENTS OF ERROR NOS. 1 AND 2

**{24}** "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN THE COURT OVERRULED APPELLANT'S CRIMINAL RULE 29 MOTION TO DISMISS AT THE CONCLUSION OF THE STATE'S CASE-IN-CHIEF AS THE PROSECUTION FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT EACH AND EVERY ELEMENT OF THE CHARGED OFFENSES OF AGGRAVATED BURGLARY AND ASSAULT."

**{25}** "THE ENTERING OF GUILTY VEREDICTS [SIC] BY THE JURY TO THE CHARGES OF AGGRAVATED BURGLARY AND ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{26}** Appellant challenges both the sufficiency and the manifest weight of the evidence. To determine whether sufficient evidence exists to support a conviction, we must determine "whether, after viewing the evidence in a light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. In determining whether a criminal judgment is against the manifest weight of the evidence, we act as a "thirteenth juror" to determine whether, "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The verdict is not against the weight of the evidence when there is evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 383 N.E.2d 132.

**{27}** "A verdict that is supported by sufficient evidence may still be against the manifest weight of the evidence. 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." ' (Emphasis sic.)" (Internal citations omitted.) *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, supra, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine.

*State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

{28} In this case Appellant was charged with violating R.C. 2903.13(C)(3), assault on a peace officer. Revised Code Section 2903.13(A) reads, "[n]o person shall knowingly cause or attempt to cause physical harm to another * * *." Revised Code Section 2903.13(C)(3) provides: "If the victim of the offense is a peace officer * * * while in the performance of their official duties, assault is a felony of the fourth degree." Appellant was also charged with violating R.C. 2911.11(A), aggravated burglary, for his conduct at Allay Senior Care. Revised Code Section 2911.11(A) reads in pertinent part, "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offence, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another." Pursuant to R.C. 2911.11, the distinction between "burglary" and "aggravated burglary" is the element of physical harm in or accompanying the criminal offense committed or to be committed within the occupied structure. In conjunction with the aggravated burglary, Appellant was charged with aggravated menacing, a violation of R.C. 2903.21(A), which states, "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." Aggravated menacing satisfies the harm element of aggravated burglary.

{29} With regard to aggravated burglary, Appellant contends that the testimony of Patrolman Abraham and Officer Reynolds is not relevant to the offense charged, and that Appellant's admitted entry into the occupied structure was not a trespass. Appellant contends that the state produced no evidence of trespass, and insinuates that because at one time he did have access to the structure and because of the short duration he remained in the building, no trespass could have occurred. With regard to the physical harm element necessary to find aggravated burglary, Appellant argues that the evidence on record is insufficient to support a conclusion that he entered Allay Senior Care intending to threaten physical harm, but that instead his purpose was to obtain his wife's final check. In support of his arguments Appellant relies primarily on his own testimony.

{30} The trial testimony of the state's witnesses, if believed, establishes that Appellant forced his way into Allay Senior Care, that he had no permission to be there, that he was repeatedly told to leave, and that he threatened to assault and kill Ms. Altman, and to assault her daughter. Appellant does not dispute that Allay Senior Care is an occupied structure. Appellant does not dispute the fact that he entered the property through his own effort. Appellant "concede[s] the mere turning of a door knob or pushing open and[sic] unlocked door has been determined by Ohio courts to satisfy the definition of force as stated in ORC §2901.01(A)(1)." (Appellant's Brf., p. 15.) If Appellant's version of events is believed, the kitchen door was unlocked and partially open, but the screen door was closed, and he opened the screen door to enter. (Tr. Vol. II, p. 348.) If Ms. Altman's and Ms. Jester's testimony

is believed, the door was locked, there was an audible pop when Appellant forced his way in, and the lock set was broken and had to be replaced. (Tr. Vol. I, pp. 166, 229-234.) Under either scenario the force element of the statute is satisfied.

{31} Appellant testified that he did not remember Ms. Altman's message in detail beyond the fact that his wife had been fired. (Tr. Vol. II, 342-344.) Nevertheless, he does not dispute Ms. Altman's testimony that she requested that Mrs. Marcum no longer come to the property, no longer contact the residents and no longer contact the staff of Allay Senior Care now that she had been fired. Most importantly, he does not dispute that Ms. Altman promised that his wife would receive her check on time, the very next day, either via hand delivery or the U.S. Mail if she preferred. Id. Although Appellant had participated in some events at the facility, he was not then and never had been an employee or a resident of the facility. Moreover, he had been told that his stated purpose was futile, as no check was available to him that night. The only reasonable interpretation of Appellant's testimony, as well as that of Ms. Altman and Ms. Jester, is that Appellant was trespassing. No fact in evidence supports a conclusion that Appellant had a right to enter the facility that night.

{32} With regard to Appellant's stated reason for going to the facility that night, Appellant's own testimony reflects that not only was Ms. Altman habitually timely in providing employees' checks, she had on several occasions provided his wife's check early. "[T]here have been several occasions, um, probably more often than not, we would need to get her paycheck prior to the 10th or the 25th; whether it

be three or four days, or a week. And there was never any-- never a problem if she wanted to get her check early." (Tr. Vol. II, p. 347.) Appellant testified at trial that although he was admittedly angry his wife had been fired, and although he expressed himself loudly, obscenely and profanely, his sole purpose and concern at approximately 9:40 p.m. on December 9, 2009 was to secure his wife's paycheck several hours before it was due, after being informed that it was not ready. (Tr. Vol. II, p. 347.) While there was testimony that the check had been provided early from time to time in the past, there is nothing in the record that suggests that the check was ever immediately available for the asking, or that Appellant had a reasonable expectation that it would be given to him instead of his wife. In the absence of any plausible explanation of Appellant's sudden decision to forcefully collect his wife's check, (1) the day before payday, (2) when he had been told it was not ready, and (3) when there was no reason to believe his wife's check would be given to him, it is entirely reasonable that the jury concluded Appellant's stated purpose for entering Allay Senior Care on December 9th was not credible.

{33} Appellant attempts to manufacture a conflict between the testimony of Ms. Altman and the dispatcher, by emphasizing the fact that the dispatcher did not directly testify that she heard threats, but instead testified generally that she heard Appellant's raised voice and later, heard glass breaking. He emphasizes that the dispatcher specifically reported hearing Appellant demand the check and say he was coming for the check, but could not repeat any other phrases verbatim. Hence,

Appellant's argument appears to be that since the dispatcher heard no threats, none could have been made.

{34} In so doing, Appellant overlooks common sense. He attempts to advance that the dispatcher, via a phone line, was in the position of an eye witness; that she could see and hear everything happening at the facility that night and testified accordingly. The record shows, however, that the dispatcher was on a different line during one call, verbally dispatched the officers from the next room while events were unfolding, was then left on hold while Ms. Altman changed locations, and at one point left the line to have a conversation with an officer who was uncertain where to respond to the call. The record simply does not support the construction of the dispatcher's testimony advanced by Appellant. Appellant's argument also requires that the testimony of Ms. Altman and her daughter, both of whom were physically present during the events, be completely ignored. Although a factfinder may, if it chooses, disregard testimony in this fashion, it is readily apparent the jury did not. Ultimately the question was one of credibility, and the jury found that other witnesses were more credible than Appellant.

{35} The state's case is supported by the testimony of Ms. Altman, Ms. Jester and Ms. Richards, all of whom testified to hearing threats that evening. Their testimony appears to be consistent with the testimony given by the dispatcher, Patrolman Abraham and Officer Reynolds as well as the log from that night. The evidence in the record does not support a conclusion that the jury lost its way in

believing the state's version of the events at issue in this case. Accordingly, Appellant's first and second assignments of error are overruled.

ASSIGNMENT OF ERROR NO. 3

**{36}** "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN IT PERMITTED THE STATE OF OHIO TO PRESENT INTO EVIDENCE IN THE STATE'S CASE-IN-CHIEF HEARSAY TESTIMONY OF PRIOR BAD ACTS ALLEGEDLY COMMITTED BY THE APPELLANT."

**{37}** Appellant was charged with aggravated burglary. The predicate crime alleged in the indictment was aggravated menacing. The elements of aggravated menacing require a threat to the person, property, or family of another, coupled with the victim's belief in, and fear resulting from, the threat. (See Legislative Serv. Comm. 1973 note to R.C. 2903.21, explaining that the offender merely must have a purpose to intimidate or know that his conduct would probably intimidate). While the victim's subjective belief is an element of aggravated menacing, neither the reasonability of that belief nor the actual ability of the accused to carry out the threat are necessary to establish the elements of the offense. *Dayton v. Dunnigan* (1995), 103 Ohio App.3d 67, 71, 658 N.E.2d 806. It is sufficient to prove that the victim, in the moment, believed the defendant to be in earnest and capable of acting. Even a conditional threat can constitute a violation of the menacing laws. *State v. Collie* (1996), 108 Ohio App.3d 580, 582-583, 671 N.E.2d 338. Thus, a person can be convicted of aggravated menacing even though the person has not made any movement toward carrying out the threat. Id. at 583. See also, *State v. Klempa*, 7th Dist. No. 01 BA 63, 2330-Ohio-3482. In this instance, evidence from Ms. Altman that Appellant had made threats to her and threats to her daughter, that she believed he

was capable of acting on those threats, and that she was in fear, was necessary in order to sustain a conviction.

{38} On appeal Appellant revives the hearsay objection made at trial to Ms. Altman's testimony, and seeks to add an Evid.R. 404(B) objection, which was not raised at trial and is thus waived but for plain error. Crim.R. 52(B). "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Evidence Rule 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." With regard to the hearsay and bad acts objections, Appellant's third assignment of error is not well-taken. The statements were not hearsay within the meaning of the rule, because they were not offered for the truth of the matter asserted, nor were they introduced simply to demonstrate Appellant's bad character.

{39} At trial during his direct examination of Ms. Altman, the prosecutor asked: "Did you have reason to believe that [Appellant] had the will or the ability to carry through with the threats that [Appellant] made to you that he would kill you, or that he would beat you up and so forth." Ms. Altman responded "[y]es," and elaborated, "[f]or the year and a half that [Mrs. Marcum] worked for me she was beat [sic]." (Tr. Vol. I, p. 172.) Defense counsel objected and was overruled. Ms. Altman

continued, "[s]he had a black eye. She had bruises on her back. She would show me bruises on her hip. She would show me bruises on her arms," because her husband "got mad" and "popped her." (Tr. Vol. I, p. 173.) Pursuant to R.C. 2903.21 the state was obligated to introduce evidence of subjective belief on Mr. Altman's part that she had a real fear of harm, and the testimony was offered for this stated purpose, not for the impermissible purpose of proving that Appellant was a wife-beater. Although it does appear that the state took full advantage of any latitude permitted, this does not remove the testimony from the realm of permissible.

{40} Ms. Altman further testified that she had confronted Mrs. Marcum concerning the bruises and that Mrs. Marcum acknowledged that her husband was responsible. (Tr. Vol. I, pp. 172-173.) Ms. Altman continued to explain that she had encouraged Mrs. Marcum to leave her husband, but that Mrs. Marcum was not willing to do so. At this point the testimony appears to have moved beyond her belief in the seriousness of Appellant's threats and defense counsel renewed his objection. (Tr. Vol. I, pp. 174-175.) The state responded that the testimony went to the victim's belief, however, the objection was sustained and the line of questioning ended.

{41} Apart from Ms. Altman's testimony on direct, it was Appellant, not the state, who put his wife on the stand to answer questions about the allegations of abuse, opening the door to the state's rebuttal witness and introducing the majority of the testimony concerning spousal abuse. Additional testimony concerning alleged acts of violence and Appellant's alleged pattern of abusive behavior came very close to belaboring the point, and the state certainly took full advantage of the further

opening provided by Appellant, but under the facts of the case presented by the record here, we cannot find this constituted error. The testimony was not hearsay because it was not offered for the truth of the matter asserted, and it was, at least in part, invited by Appellant. The testimony was therefore within the trial court's discretion to allow. While it appears that the testimony comes very close to violating the prohibition against bad acts testimony concerning character, the testimony was both directly relevant to the state's burden under R.C. 2903.21 and, again, at least in part invited and embellished by Appellant. Additionally, Appellant did not raise an objection on the basis of character testimony, and we cannot say that, from this record, had the testimony not been offered Appellant would not have been convicted.

{42} Questions of admissibility are subject to the discretion of the trial court, absent an abuse of discretion, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. Although the court may have allowed more information than strictly necessary to satisfy the requirements of aggravated menacing, the decision was within the court's discretion and is not barred by Evid.R. 404(B) or 801(C). The court stated a purpose for allowing the testimony and a purpose for ending the line of questioning, evidencing that the decision was not arbitrary, or unconscionable, nor

was it unreasonable under the circumstances. Appellant's third assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 4

{43} "APPELLANT WAS DENIED A FAIR TRIAL THROUGH PROSECURIAL [SIC] MISCONDUCT IN VIOLATION TO APPELLANT'S CONSTITUTIONAL RIGHT OF DUE PROCESS."

{44} The standard of review for prosecutorial misconduct is whether the actions by the prosecution were improper, and, if so, whether they prejudiced Appellant's substantial rights. *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749. "In determining whether the prosecutor's statements affected a substantial right of the defendant, an appellate court should consider the following factors: (1) the nature of the remarks; (2) whether an objection was made by defense counsel; (3) whether the court gave any corrective instructions; and (4) the strength of the evidence presented against the defendant.'" *State v. Scott*, 7th Dist. No. 07 MA 152, 2009-Ohio-4961, ¶85, quoting *State v. Breland*, 11th Dist. No. 2003-A-0066, 2004-Ohio-7238, ¶29. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived Appellant of a fair trial based on the entire record. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293; *State v. Skidmore*, 7th Dist. No. 08 MA 165, 2010-Ohio-2846, ¶44; appeal not allowed, 2010-Ohio-4928, 126 Ohio St.3d 1602, 935 N.E.2d 47. The latitude afforded prosecutors in closing argument does not "'encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial' or 'allud[ing] to

matters not supported by admissible evidence.'" *State v. Freeman* (2000), 138 Ohio App.3d 408, 419, 741 N.E.2d 566, quoting *State v. Hart* (1994), 94 Ohio App.3d 665, 671, 641 N.E.2d 755. A closing argument is considered in its entirety to determine whether it was prejudicial. *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 407 N.E.2d 1268; *Skidmore*, ¶53. Finally, the test for prosecutorial misconduct focuses on "the fairness of the trial, not the culpability of the prosecutor." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶91, 781 N.E.2d 88.

### (a) Misconduct in Case-in-Chief

{45} Appellant identifies three instances alleged to be prosecutorial misconduct during the state's case-in-chief. The first was made by the prosecutor while examining the dispatcher and referred to Appellant as "not a gentleman." (Tr. Vol. I, p. 131.)

{46} The second statement was made during the state's cross-examination of Appellant and suggested that Appellant: "[made] a living through [his] wife's employment" to which Appellant replied: "No. Um, I actually draw more money on unemployment than my wife made salary in a month." (Tr. Vol. II, p. 361.)

{47} In both of these instances no objection was raised before the trial court, therefore Appellant has waived all but a plain error review. Crim.R. 52(B). Use of the discretionary plain error doctrine requires an obvious error that affected substantial rights under exceptional circumstances. Crim.R. 52(B); *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. There is no plain error unless the outcome

clearly would have been different but for the error. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043. Neither of these instances is plain error.

**{48}** Both remarks reflected the prosecutor's wholly subjective opinion of Appellant's conduct and were editorial in nature. Neither comment addressed an element of the crimes charged. Regardless, no objection was raised at trial by defense counsel. The jury had been instructed by the court that statements made by the attorneys throughout the course of the case were not evidence. Independent of and unaffected by the prosecutor's statements, sufficient evidence appears in the record pertaining to each element of the offense charged. Neither statement meets any of the criteria identified in the plain error standard: they are not obvious errors; they do not appear to affect a substantial right; nor are exceptional circumstances alleged by Appellant.

**{49}** The third instance of alleged misconduct occurred during the state's examination of Mrs. Marcum. When the prosecutor asked Mrs. Marcum why Appellant no longer worked for a local drywaller, he said: "Your husband didn't tell you because it was [for the reason that] he was caught smoking pot on the job." (Tr. Vol. II, p. 326.) Defense counsel responded with a hearsay objection which was sustained, and the prosecutor abandoned the line of questioning. The question was not relevant to the elements of the crimes charged nor did it reflect conduct relevant to evidence properly before the court. Although there was no specific subsequent instruction by the court to disregard, the jury had been previously instructed to disregard questions and/or answers where objections were sustained and to "treat

them as if you did not hear them." (Tr. Vol. I, p. 99.) This comment differs from the first two, as counsel did object, and it can only be called gratuitous and inappropriate. Nevertheless Appellant must show prejudice as a result of the statement.

{50} The Ohio Supreme Court considered similar circumstances in *State v. Apanovich* (1987), 33 Ohio St. 3d 19, 514 N.E. 2d 394 and found "[t]he conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial. Here, the prosecutor's questioning cannot be characterized as denying appellant a fair trial. Improper questions were properly objected to and objections were often sustained by the trial court. The prosecutor did not embark on or embrace a pattern of repeated or egregious abuse of examination or cross-examination." (Internal citation omitted). Id. at 24. Here, as in *Apanovich*, the incident was isolated, the objection was sustained, and there was no pattern of abuse. Under these circumstances, the prosecutor's conduct does not rise to the level of misconduct, nor does it appear to have impacted Appellant's substantial rights.

### (b) Misconduct in Closing

{51} Appellant identifies the following comments as having a pivotal effect on the jury to the extent that Appellant was deprived of a fair trial: "he [the prosecutor] characterized the Appellant to the jury as loaded up on pills and alcohol; a bully to women; gravy train is coming to an end that's why he was pissed off; Appellant is unemployed going to have to start doing something, that's why he is pissed off; and finally telling the jury we need to stand up to bullies." (Appellant's Brf., pp. 27–28.)

With regard to the first four statements there is ample material in the record concerning each allegation, often in Appellant's own words. Appellant testified he took multiple medications and combined them with multiple drinks that night, Appellant even suggested to the arresting officers that the combination of the drink and medication explained his poor behavior during and after the arrest. (Tr. Vol. II, pp. 336, 352-359.) Appellant admitted he was angry with Ms. Altman, he admitted to his use of abusive language, and admitted to shouting at her, all aggressive behaviors that might be fairly characterized as "bullying." (Tr. Vol. II, pp. 343, 346-347.) Finally, Appellant admitted to being unemployed, to being directly interested in his wife's income, to being reliant on it for his living expenses, and to being angry that his wife had been fired, again, all facts that might be characterized by the prosecutor in a closing argument. (Tr. Vol. II, pp. 333; 344; 346-347; 349.)

{52} Once again, the statements Appellant now complains of were made absent an objection in the trial court. As such, if the comments constitute misconduct, they must also be so egregious as to rise to the level of plain error. Crim.R. 52(B). Even where a comment rises to the level of plain error, the error itself may not be reversible error, unless it operated to deprive the defendant of a fair trial. *State v. Davis* (1996), 76 Ohio St.3d 107, 119; 666 N.E.2d 1099), citing *Smith v Phillips* (1982), 455 U.S. 209, 220; 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 88, fn. 10. In each instance the statement identified in Appellant's brief may be directly tied to testimony. Comment upon testimony is "within the bounds of the prosecutor's wide latitude in closing argument." *State v. Davis* (1996), 76 Ohio St.3d 107, 119, 666

N.E.2d 1099. Where there is a direct relationship it is "not improper for a prosecutor to comment upon the evidence in his closing argument and to state the appropriate conclusions to be drawn therefrom." *State v. Breland*, 11th Dist. No. 2003-A-0066, 2004-Ohio-7238, ¶30, citing *Davis* at 119. In context, none of the statements identified by Appellant constitute misconduct. Each statement may be directly tied to evidence and therefore fell within the latitude allowed a prosecutor in closing. There is no need for the court to "invoke a plain error analysis" if none "of the complained of prosecutorial comments constituted misconduct." *Davis* at 119.

{53} With regard to the fifth statement, "telling the jury we need to stand up to bullies," the statement again does not rise to the level of reversible error. (Appellant's Brf., p. 27.) Statements by the prosecutor in closing arguments that exhort the jury to do its duty, so long as they are not retributive in nature, but instead designed to "maintain community standards," are appropriate. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 419; 613 N.E.2d 212 citing *State v. Williams* (1986), 23 Ohio St.3d 16, 490 N.E.2d 906. The prosecutor's statement, in context, is not of the type designed to obtain a conviction "based solely on the inflammation of fears and passions, rather than proof of guilt" which requires reversal. Id. at 20. Rather, it appears as the type of "request that the jury maintain community standards" that is permissible and does not deny Appellant his right to a fair trial and an impartial jury. Id. None of the statements identified by Appellant amount to misconduct. Appellant's substantial rights were not adversely affected by the contents of the state's closing. Appellant's fourth assignment of error is overruled.

Conclusion

**{54}** Appellant's first and second assignments of error challenged the weight and the sufficiency of the evidence supporting conviction. At trial the state presented substantive, probative testimony and pictorial evidence of the events of December 9, 2009, relevant to the crimes charged. There is no indication in the record that the jury lost its way or that any single element of the available evidence was given undue weight. Where, as here, adequate evidence appears in the record, the decision of the factfinder as to the credibility of the witnesses is to be given due deference. The record in this instance supports the trial court's verdict. Accordingly, Appellant's first and second assignments of error are overruled.

**{55}** Appellant's third assignment of error renews a hearsay objection that was overruled at trial and raises a new Evid.R. 404(B) objection to the same testimony. As the testimony was not offered at trial for an improper purpose, neither rationale supports a reversal of the trial court's evidentiary ruling. While the testimony was unnecessarily embellished and thus, may come close to crossing a line, this embellishment was caused, at least partially, by Appellant. This record reflects that the testimony was within the trial court's discretion to allow and the court articulated its reasons for doing so and Appellant's third assignment of error is overruled.

**{56}** Appellant's fourth assignment of error challenges as improper three statements made by the prosecutor during the state's case-in-chief, and four statements made during closing argument. At trial the defense objected to only one

of the three statements in the case-in-chief, the objection was sustained, and the line of questioning abandoned. The court's ruling was an appropriate, adequate remedy and the jury had been property instructed. Neither the statements identified for the first time on appeal, nor the statement objected to in the lower court prevented Appellant from receiving a fair trial. Appellant's fourth assignment of error is overruled.

{57} Appellant's pending motion for release is denied as moot. The trial court's judgment is affirmed.

Vukovich, J., concurs.

DeGenaro, J., concurs.