[Cite as *State v. Wilcoxson*, 2021-Ohio-4339.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29053 |
| | : | |
| v. | : | Trial Court Case No. 2021-CRB-1 |
| | : | |
| KEY'AUDI WILCOXSON | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of December, 2021.

. . . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101 and ANDREW D. SEXTON, Atty. Reg. No. 0070892, City of Dayton Prosecutor's Office, 335 West Third Street, Room 390, Dayton, Ohio 45402
      Attorneys for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Key'Audi Wilcoxson, appeals from his conviction for aggravated menacing following a bench trial in the Dayton Municipal Court. In support of his appeal, Wilcoxson argues that his trial counsel provided ineffective assistance by failing to move for a trial continuance and by failing to file a timely jury demand. Wilcoxson also contends that he was denied his constitutional right to due process as a result of the State's failure to provide certain video evidence in discovery. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On January 1, 2021, Wilcoxson was charged by complaint with one count of aggravated menacing in violation of R.C. 2903.21(A), a misdemeanor of the first degree, and one count of menacing in violation of R.C. 2903.22, a misdemeanor of the fourth degree. The charges stemmed from allegations that Wilcoxson made threats of serious physical harm to an employee of a laundromat where Wilcoxson was allegedly loitering. Wilcoxson pled not guilty to the charges, and his case was set for a trial.

{¶ 3} Wilcoxson's trial was originally scheduled for January 14, 2021 but was later continued to January 27, 2021. On January 22, 2021, the January 27th trial date was removed from the trial court's schedule. Before a new trial date was scheduled, on February 3, 2021, Wilcoxson filed a handwritten letter requesting that the trial court remove his appointed counsel on grounds that counsel was not communicating with him. On February 17, 2021, the trial court removed Wilcoxson's counsel and appointed new counsel to represent him. Also on February 17th, the trial court sent a notice to

Wilcoxson in jail notifying him that his trial date had been rescheduled for February 25, 2021.

{¶ 4} At trial, Wilcoxson's newly appointed counsel made an oral demand for a jury trial and filed a written jury demand later the same day. The trial court found that the jury demand was untimely and declined to delay Wilcoxson's trial any further. The matter was then tried to the bench as scheduled.

{¶ 5} The State's first trial witness was Tane Smith, who owned a laundromat in Dayton called "At Your Service Coin Laundry." Smith testified that when she arrived at the laundromat at 1:10 p.m. on January 1, 2021, she observed Wilcoxson inside the laundromat. Smith testified that when she initially saw Wilcoxson, she noticed that he was following a lady around. However, Smith testified that she eventually saw Wilcoxson put a load of laundry into a washer sometime before she left the laundromat at 2:00 p.m. Smith testified that while she was away, she remotely monitored the laundromat's security cameras using her cell phone; when she checked the cameras at 3:30 p.m. she saw that Wilcoxson was still inside the laundromat. Smith testified that she then contacted her on-duty employee, Sarah Wagner, and asked Wagner to tell Wilcoxson to leave the premises.

{¶ 6} The State also called Wagner to testify at trial. During her testimony, Wagner confirmed that Smith had asked her to tell Wilcoxson to leave the laundromat. Wagner testified that she approached Wilcoxson shortly before 4 p.m. and advised him that he had to leave the premises because he had been there for multiple hours. Wagner testified that Wilcoxson's response was that "he didn't have to fucking leave" and that "no one could make him leave." Trans., p. 27. Wagner testified that she called Smith back

and advised her that Wilcoxson refused to leave the laundromat. Wagner testified that Smith instructed her to call the police in order to have Wilcoxson removed from the premises, and Wagner called the police as instructed by Smith.

{¶ 7} Wagner testified that, after she called the police, Wilcoxson told her that he would "punch" and "kill" her and that she "would only bleed out for two minutes." *Id*. at 28. Wagner testified that these threats were made while she was standing by the laundromat's office and while Wilcoxson was standing 20 to 25 feet away at the front of the laundromat. Wagner testified that she believed Wilcoxson's threats and therefore called the police a second time, because she feared that Wilcoxson was going to hurt her.

{¶ 8} Continuing, Wagner testified that after making her second call to the police, Wilcoxson began to approach her by the laundromat's dryers. Wagner testified that as Wilcoxson approached her, he had something in his hand that looked like a knife. The "knife" was identified by Wagner at trial, and it is best described as a serrated cheese spreader. *See* State's Exhibit 1. Wagner testified that she told Wilcoxson to back up as he was approaching her with the cheese spreader. Wagner testified that as Wilcoxson was approaching her, a patron of the laundromat, later identified as Carlos Brewer, intervened. According to Wagner, Brewer and Wilcoxson began exchanging words, and Wilcoxson pulled out a hammer and attempted to hit Brewer with it. The hammer was also identified by Wagner at trial and admitted into evidence as State's Exhibit 2.

{¶ 9} Wagner testified that she observed Brewer take the hammer from Wilcoxson and throw the hammer outside across the parking lot; Wilcoxson and Brewer then began fighting with each other outside. Wagner testified that Brewer eventually reentered the

laundromat, and Wilcoxson followed him. At that time, Wagner saw Wilcoxson pull out the cheese spreader again. Wagner testified that Wilcoxson cut Brewer on the arm and forehead with the cheese spreader. Thereafter, Wagner saw Wilcoxson go outside and throw the cheese spreader and hammer on the roof of the laundromat. Wagner testified that Wilcoxson then came back inside the laundromat and began calling her a whore and a drug user.

{¶ 10} Wagner testified that the entire incident with Wilcoxson lasted about an hour and that she was concerned for her safety the entire time; she believed that Wilcoxson would actually hurt her given his angry, aggressive demeanor. Wagner testified that she was very scared at the time of the incident and that she was still scared of Wilcoxson.

{¶ 11} The State next presented testimony from Officer Gregory Paxton of the Dayton Police Department. Officer Paxton testified that he was the first officer to arrive at the laundromat after Wagner's call. Officer Paxton testified that upon his arrival, he was approached by a very agitated Wilcoxson, and Wilcoxson told him that he threw the hammer and cheese spreader on the roof of the laundromat in order to get them away from Brewer. Officer Paxton testified that the fire department recovered the hammer and cheese spreader from the roof, and that his fellow officer, Officer Hubbard, placed the hammer and cheese spreader in the police department's property room.

{¶ 12} Officer Paxton also testified to transporting Wilcoxson to jail in his police cruiser. Officer Paxton recalled speaking to Wilcoxson during the transport and noted that Wilcoxson had told him that he wanted to press charges against Brewer. On cross-examination, Officer Paxton confirmed that his police cruiser was equipped with cameras for video and audio recording.

{¶ 13} The State also presented testimony from Officer Phillip Hubbard of the Dayton Police Department. Officer Hubbard testified that when he arrived at the scene, he took witness statements from Wagner, Brewer, and Smith. Officer Hubbard testified that after taking the witness statements, it was decided that Wilcoxson was going to jail. Officer Hubbard testified that when he advised Wilcoxson that he was going to jail, Wilcoxson attempted to kick the windows out of Officer Paxton's police cruiser. Officer Hubbard testified that when he instructed Wilcoxson to cease and desist, Wilcoxson claimed to be a violent individual and indicated that he would not stop kicking the windows. Officer Hubbard also confirmed that he had collected the cheese spreader and hammer from the fire department and had placed those items in the police department's property room.

{¶ 14} The last witness at trial was Wilcoxson, who testified in his own defense. Wilcoxson testified that he was homeless and that he was at the laundromat on the day in question for purposes of laundering his multiple layers of clothing that were wet from the rain. Wilcoxson testified that a laundromat employee, Wagner, initially approached him outside while he was smoking and drinking with a lady who was also at the laundromat. According to Wilcoxson, Wagner told him that he was loitering and needed to "mother fucking leave." Trans., p. 87-88. Wilcoxson also claimed that Wagner told him: "[I]f you won't leave, I'm gonna call my sons and my boyfriend, my husband." *Id.* at 88. Wilcoxson testified that he looked at Wagner like she was crazy because he was still doing his laundry. Wilcoxson testified that he told Wagner: "Bitch you ain't talking to me. * * * You talking to me sideways. I'm not loitering. I'm paying--I'm an actual paying customer." *Id.* at 88-89.

{¶ 15} Wilcoxson testified that he and Wagner continued their argument inside the laundromat. Wilcoxson claimed that Wagner told him that her boyfriend or husband was going to "fuck [him] up * * * because [he] was disrespecting her." *Id.* at 89. Wilcoxson testified that he told Wagner that he doesn't "fear nobody but God and the police" and that Wagner could call whoever she wanted to call. *Id.* Wilcoxson testified that he then went back outside to smoke more cigarettes while Wagner called the police. Wilcoxson testified that while he was outside, he placed a hammer that he carried for protection upside down on the sidewalk. Wilcoxson testified that he did this because he had a violent history and did not want the police to tase or shoot him for having a weapon.

{¶ 16} Wilcoxson testified that when he went back inside the laundromat, he noticed that Wagner had stopped the dryer in which he had been drying his clothes. Wilcoxson testified that he began cussing at Wagner and said: "Bitch, why you touching my clothes." *Id.* at 91. Wilcoxson testified that he then went back outside and noticed that his hammer was missing. Wilcoxson testified that a patron of the laundromat, Brewer, then came from behind the laundromat building and said: "Yeah, bitch I got your hammer now." *Id.* at 92.

{¶ 17} Wilcoxson testified that he and Brewer started fighting outside and that Brewer swung the hammer at him. Wilcoxson claimed that he deflected Brewer's swing with his arm and scratched Brewer on the head in the process. Wilcoxson also claimed that he pulled out the cheese spreader and threw it on the roof of the laundromat because he realized a cheese spreader was not going to help him defend himself against a hammer. Wilcoxson testified that he eventually took the hammer away from Brewer and threw it on the roof of the laundromat too. Continuing, Wilcoxson testified that the police

arrived shortly after he threw the cheese spreader and hammer on the roof. According to Wilcoxson, the police arrested him before he could tell them what happened. Wilcoxson claimed that as he was getting arrested, he asked the officers to get video footage from surveillance cameras that he observed outside the businesses surrounding the laundromat, so that he could prove that he had been defending himself against Brewer. Wilcoxson also confirmed that Wagner was not outside for most of the altercation, and that he and Wagner had only exchanged threats.

{¶ 18} On cross-examination, Wilcoxson admitted that he "went crazy" and verbally threatened Wagner after she had threatened to have him removed from the laundromat. Trans., p. 98. Wilcoxson, however, claimed that he could not remember exactly what he said when he threatened Wagner. Wilcoxson also admitted to saying that he was violent when Officer Hubbard asked him to stop kicking the back of the cruiser.

{¶ 19} Throughout the trial, Wilcoxson raised objections concerning the video evidence that was discussed during the trial testimony. Wilcoxson advised the trial court that the State had not provided him with the video footage from the laundromat's security cameras, the video footage from Officer Paxton's police cruiser, or any surveillance video footage from the businesses surrounding the laundromat. Wilcoxson argued that the foregoing video evidence would have bolstered his credibility and contradicted the State's witnesses. Wilcoxson also argued that the video footage from the laundromat's security cameras would have been the best evidence of his altercation with Wagner. Wilcoxson clarified that he was not raising a discovery violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but simply claimed that he was prejudiced by

the State's failure to provide the aforementioned video evidence.

{¶ 20} In response, the State indicated that it did not provide the video evidence to Wilcoxson because none of the video evidence was in the State's possession. The State explained that it did not know about the laundromat security camera footage until the owner of the laundromat, Smith, testified at trial. On cross-examination, Smith testified that she left a voicemail with the police department advising that she had the laundromat security camera footage on a USB drive at her office, but she claimed that no one from the police department ever collected the USB drive. The State, therefore, advised the trial court that it had never received any surveillance videos from the police department.

{¶ 21} The State also indicated that it had never obtained the video footage from Officer Paxton's police cruiser because the aggravated menacing and menacing offenses at issue occurred prior to Wilcoxson's interaction with police. The State noted that Wilcoxson never requested the video footage in discovery and that it would have provided Wilcoxson with the cruiser camera footage if Wilcoxson had asked for it.

{¶ 22} After hearing the parties' arguments, the trial court noted Wilcoxson's objection to the video evidence for the record but ultimately determined that the video evidence at issue would not have corroborated or supported either party's case. The trial court found that the State would have been required to turn over the laundromat security camera footage to Wilcoxson had it been in the State's possession. However, since it wasn't in the State's possession, and since there was nothing on the record indicating that the laundromat security camera footage was equipped with audio, the trial court found that the witnesses' testimony was sufficient evidence of the statements made during the altercation.

{¶ 23} After the defense rested, and after the trial court addressed Wilcoxson's arguments, the trial court found Wilcoxson guilty of both aggravated menacing and menacing. Thereafter, the State advised the trial court that the two offenses should merge into one conviction and that the State would like to have Wilcoxson convicted for aggravated menacing. The trial court agreed that a merger of the offenses was appropriate and thereafter sentenced Wilcoxson for aggravated menacing as elected by the State. The trial court sentenced Wilcoxson to 180 days in jail with 40 days suspended and 68 days of jail-time credit. The trial court also ordered Wilcoxson to pay a $25 fine and court costs.

{¶ 24} Wilcoxson now appeals from his conviction, raising two assignments of error for review.

**First Assignment of Error**

{¶ 25} Under his first assignment of error, Wilcoxson contends that his trial counsel provided ineffective assistance because counsel failed to move for a trial continuance despite counsel's entering the case only a week before trial. Wilcoxson also contends that his trial counsel was ineffective for failing to file a timely jury demand.

{¶ 26} In order to succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective

assistance of counsel. *Strickland* at 697.

{¶ 27} To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688; *Bradley* at 142. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. "[A] debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.), citing *Strickland* at 689. (Other citation omitted.) To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus.

{¶ 28} As previously noted, Wilcoxson first claims that his trial counsel provided ineffective assistance by failing to move for a trial continuance. However, "the decision whether to request a trial continuance is debatable, and involves a strategic choice of counsel that falls 'within the realm of trial strategy and tactics that will not ordinarily be disturbed on appeal.' " *State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 90, quoting *State v. Warner*, 8th Dist. Cuyahoga No. 95750, 2012-Ohio-256, ¶ 11, citing *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270 and *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263. Because "requesting continuances is a matter of trial tactics and strategy, * * * we will not second-guess trial counsel's decision in this regard." *Id. at* ¶ 5. Therefore, Wilcoxson has failed to

establish deficient performance on the part of his trial counsel.

{¶ 29} Wilcoxson also cannot establish that the outcome of his case would have been different had his counsel requested a trial continuance; it is pure speculation as to whether the trial court would have granted a trial continuance if one had been requested. "Such speculation is insufficient to establish ineffective assistance." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119, quoting *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 219 and *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 121. As a result, Wilcoxson also cannot establish that he was prejudiced by his trial counsel's failure to request a trial continuance. Therefore, Wilcoxson's first ineffective assistance claim lacks merit.

{¶ 30} For his second ineffective assistance claim, Wilcoxson contends that his trial counsel performed deficiently and prejudiced him by failing to file a timely jury demand. Crim.R. 23(A) provides that "[i]n petty offense cases, where there is a right of jury trial, the defendant shall be tried by the court unless he demands a jury trial." A jury demand "must be made in writing and filed with the clerk of court not less than ten days prior to the date set for trial, or on or before the third day following receipt of notice of the date set for trial, whichever is later." Crim.R. 23(A). "[A] defendant charged with a misdemeanor waives the right to a jury trial unless he makes a timely written demand in accordance with Crim.R. 23(A)." (Citations omitted.) *State v. Matthews*, 2d Dist. Greene No. 2015-CA-73, 2016-Ohio-5055, ¶ 11. The time limits set forth in Crim.R. 23(A) "are to be computed with respect to the last scheduled trial date." *City of Tallmadge v. DeGraft-Biney*, 39 Ohio St.3d 300, 530 N.E.2d 1310 (1988), syllabus.

Therefore "a continuance of the trial will renew the time within which to file a jury demand." *Id.*

{¶ 31} In this case, Wilcoxson was tried for first-degree misdemeanor aggravated menacing and fourth-degree misdemeanor menacing, both of which were petty offenses with a right to jury trial. *See* Crim.R. 2(D) and R.C. 2945.17(A) and (B). Therefore, Wilcoxson was required to file a timely, written jury demand in order to receive a jury trial for those offenses. Crim.R. 23(A). The record indicates that the trial court sent a notice to Wilcoxson on February 17, 2021, informing him that his trial was rescheduled for February 25, 2021. Given the timing of that notice, Wilcoxson was required to file a written jury demand "on or before the third day following the receipt of notice of the date set for trial." Crim.R. 23(A). Wilcoxson therefore had three days from February 17, 2021, to file his jury demand, which was February 20, 2021. Because February 20, 2021, fell on a Saturday, pursuant to Crim.R. 45(A), Wilcoxson had until Monday, February 22, 2021, to file his jury demand.

{¶ 32} There is no dispute that Wilcoxson's trial counsel filed an untimely jury demand on the day of Wilcoxson's February 25th trial. However, even if we assume that Wilcoxson's trial counsel performed deficiently in that regard, the test for ineffective assistance is whether any prejudice arose from counsel's deficient performance. *State v. Ware,* 2d Dist. Darke No. 2018-CA-8, 2019-Ohio-2595, ¶ 31, citing *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph two of the syllabus.

{¶ 33} In this case, Wilcoxson has not established that he suffered any prejudice as a result of his trial counsel's performance. More specifically, Wilcoxson has not demonstrated that the outcome of his trial would have been different had his trial counsel

filed a timely jury demand. The mere fact that Wilcoxson *could* have had a jury trial had his counsel filed a jury demand does not establish prejudice. *See State v. Escobar*, 1st Dist. Hamilton Nos. C-200423, C-200424, 2021-Ohio-4001, ¶ 28, citing *State v. Fitzgerald*, 9th Dist. Summit No. 22381, 2005-Ohio-2411, ¶ 13 ("merely argu[ing] that he could have had a jury trial had his counsel filed a demand notice * * * fails to establish prejudice") and *State ex rel. Maxwell v. Trikilis*, 9th Dist. Medina No. 06CA0071-M, 2007-Ohio-1355, ¶ 27 ("[w]ith respect to a jury demand, Appellant has failed to demonstrate that the result of his bench trial would have been different but for his counsel's failure to make a jury demand"). *Accord State v. Stroud*, 11th Dist. Ashtabula No. 2017-A-0028, 2018-Ohio-904, ¶ 27; *State v. Bullard*, 9th Dist. Wayne No. 20AP0032, 2021-Ohio-4044, ¶ 23.

{¶ 34} Furthermore, at trial, Wilcoxson admitted to verbally threatening Wagner on the day in question and to telling the police that he was a violent person. Wagner also unequivocally testified that Wilcoxson threatened to punch and kill her and that she believed those threats due to Wilcoxson's angry, aggressive demeanor. Given the testimony presented at trial, especially Wilcoxson's admission to threatening Wagner, we find that Wilcoxson has not demonstrated a reasonable probability that the outcome of his trial would have been different had his counsel filed a jury demand. *See Ware* at ¶ 30 (finding that the evidence against defendant was so overwhelming that there was no reasonable probability that the result of the proceedings would have been different absent counsel's failure to file a timely jury demand). Because Wilcoxson has not established prejudice arising from counsel's failure to file a jury demand, his second ineffective assistance claim also lacks merit.

{¶ 35} Wilcoxson's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 36} Under his second assignment of error, Wilcoxson argues that his conviction should be reversed because his constitutional right to due process was violated as a result of the State failing to turn over: (1) the video footage recorded by the laundromat's security cameras; (2) the video footage recorded in Officer Paxton's police cruiser; and (3) the video footage recorded by businesses surrounding the laundromat. We note that Wilcoxson's due process argument is not based on an alleged violation of *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, i.e., that the State withheld exculpatory evidence in discovery. Instead, Wilcoxson argues that the State's failure to provide him with the video evidence in discovery and the trial court's decision to proceed with trial despite his never receiving the video evidence prejudiced him and denied him due process. We, however, disagree.

{¶ 37} Discovery in a criminal case is governed by Crim.R. 16. Pursuant to Crim.R. 16(B), the prosecution must provide any evidentiary materials "which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial" upon written request of the defendant. If a party fails to comply with the disclosure requirements of Crim.R. 16, the trial court has the discretion to "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1).

{¶ 38} A violation of Crim.R. 16 does not necessarily amount to a due process

violation. *State v. Long*, 2d Dist. Greene No. 2010-CA-47, 2011-Ohio-4293, ¶ 19 (finding that "while the State's failure to provide [video evidence] constituted a violation of the discovery rules, we find no basis to conclude that [the defendant's] constitutional rights were violated by the State's failures and the trial court's subsequent orders limiting the State's disclosure obligations,"); *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), citing *U.S. v. Bagley*, 473 U.S. 667, 675 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). This court has explained that "[t]he failure to provide copies [of video evidence in discovery] may result in a denial of due process[,]" but that such a failure "is not a per se denial of the right to due process; there must be evidence of some prejudice to the defendant." (Citations omitted.) *Long* at ¶ 21.

{¶ 39} The trial court's response to an alleged discovery violation under Crim.R. 16 is reviewed for an abuse of discretion. *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "An abuse of discretion includes a situation in which a trial court did not engage in a ' "sound reasoning process." ' " *Id.*, quoting *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*

**{¶ 40}** In this case, Wilcoxson conceded at trial that the State's failure to provide the video evidence in discovery was not due to a dereliction of the State's obligation to provide discovery. *See* Trans., p. 77. In addition, the record establishes that the State did not provide the video evidence to Wilcoxson because the video evidence was either unknown to the State and/or never in the State's possession. The record also establishes that Wilcoxson's discovery request did not specifically request any of the video evidence at issue. Accordingly, there appears to be no violation of the State's obligations under Crim.R. 16. While the police department's failure to collect the video footage from the laundromat's security cameras may have constituted sloppy police work, there is nothing in the record to indicate that the police's failure to retrieve that footage was purposeful or in bad faith.

**{¶ 41}** In any event, we find that Wilcoxson was not prejudiced by the lack of video evidence in question and that the trial court did not abuse its discretion when it found that the video evidence would not have corroborated either party's version of the relevant events. Although the video footage from the laundromat's security cameras would have showed the altercation between Wilcoxson and Wagner, the trial court correctly determined that it was never established on the record that the video was equipped with audio. *See* Trans., p. 37. Without audio, the video would have had little value, since it was undisputed that Wilcoxson and Wagner had an altercation inside the laundromat on the day in question and that Wilcoxson verbally threatened Wagner. Therefore, the video would only have been helpful if it had audio, as it could have been used to determine whether Wilcoxson threatened to cause Wagner serious, physical harm. Since it was not established that the video was equipped with audio, the trial court reasonably relied

on the witnesses' testimony to determine what statements were made during the altercation. Because it is highly unlikely that the video footage from the laundromat's security cameras would have aided Wilcoxson's defense, and given that Wilcoxson admitted to threatening Wagner, we do not find that the lack of this evidence prejudiced Wilcoxson at trial.

{¶ 42} With regard to the video footage from Officer Paxton's police cruiser, the record establishes that the State never obtained that footage because the State's case in chief only concerned the verbal threats that Wilcoxson made to Wagner inside the laundromat. Because the altercation between Wilcoxson and Wagner occurred prior to the arrival of the police, the cruiser camera footage would not have aided Wilcoxson's defense against the aggravated menacing and menacing charges for which he was tried. Accordingly, Wilcoxson was not prejudiced by the State's failure to obtain the cruiser camera footage.

{¶ 43} Similarly, any surveillance video footage taken from businesses surrounding the laundromat would have only shown Wilcoxson's altercation outside with Brewer. Wilcoxson's and Wagner's testimony both indicate that Wilcoxson threatened Wagner while they were inside the laundromat. Wilcoxson himself testified that Wagner was not outside the laundromat for much of the event. Therefore, surveillance footage taken from neighboring businesses would not have aided either party's case with regard to the aggravated menacing and menacing charges. Accordingly, Wilcoxson was not prejudiced by the State's failure to obtain that video footage either.

{¶ 44} Because Wilcoxson was not prejudiced by the lack of video evidence at issue, we find no due process violation. The record indicates that Wilcoxson received a

fair trial that resulted in a verdict worthy of confidence despite the absent video footage. We also find that the trial court did not abuse its discretion when it decided to proceed with trial, as the trial court reasonably determined that the video footage would not have corroborated either party's version of the relevant events.

{¶ 45} Wilcoxson's second assignment of error is overruled.

## Conclusion

{¶ 46} Having overruled both of Wilcoxson's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Stephanie L. Cook
Andrew D. Sexton
Robert Alan Brenner
Hon. Christopher D. Roberts