[Cite as *State v. Elzey*, 2025-Ohio-5322.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-22 |
| Appellee | : | |
| | : | Trial Court Case No. 24 CRB 02206 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| JEREMIAH E. ELZEY | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 26, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

LEWIS, J., and HUFFMAN, J., concur.

**OPINION**

JACOB S. SEIDL, Attorney for Appellant
ERIN J. MCENANEY, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Jeremiah E. Elzey appeals from his conviction for aggravated menacing following a jury trial in the Clark County Municipal Court. In support of his appeal, Elzey claims that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Elzey also claims that his conviction should be reversed because the State failed to disclose material impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and Crim.R. 16. In addition, Elzey asserts that his sentence should be vacated because the trial court impaired his right to allocution by forcing him to use a Russian interpreter at his sentencing hearing despite his claim that he was no longer proficient at speaking Russian. Elzey relatedly claims that the trial court violated his right to due process by imposing the maximum sentence based on an improper inference that he was dishonest in denying his fluency in Russian. Elzey further claims that the trial court's decision to have his sole defense witness testify by writing down her answers to counsel's questions and having an unsworn court bailiff read the answers to the jury violated R.C. 2311.14, Crim.R. 22, and his constitutional right to confrontation. Lastly, Elzey argues that his trial counsel provided ineffective assistance by agreeing to this procedure for the examination of his witness. For the reasons outlined below, we find that Elzey's claims lack merit and affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On August 28, 2024, Elzey was charged by complaint with two fourth-degree misdemeanor counts of domestic violence, one first-degree misdemeanor count of assault, and one first-degree misdemeanor count of aggravated menacing. The charges stemmed from allegations that on August 21, 2024, Elzey and his fiancée's stepfather got into an argument during which Elzey grabbed a box cutter and a baseball bat and threatened to kill the stepfather. It was also alleged that Elzey caused his fiancée's mother to injure her back by pushing her and his fiancée out of the way while they were attempting to keep Elzey from approaching the stepfather.

{¶ 3} Elzey pled not guilty to the charged offenses. His case proceeded to a jury trial on January 29, 2025. On the morning of trial, the State moved to dismiss the two charges for domestic violence due to the complaining victims (the fiancée's mother and stepfather) not meeting the statutory definition of "family or household member" as required for that offense. The trial court granted the State's motion, and Elzey's trial went forward on the remaining two charges of assault and aggravated menacing. During trial, the State presented testimony from the fiancée's mother, stepfather, great-grandmother, and the deputy sheriff who arrested Elzey. Elzey testified in his defense and called his fiancée to testify as a defense witness.

{¶ 4} The evidence presented at trial established that during the incident in question, Elzey was a 21-year-old Russian immigrant who lived with his fiancée's family in a bi-level residence in New Carlisle, Clark County, Ohio. Elzey and his fiancée lived in the downstairs portion of the bi-level, while the mother, the fiancée's 16-year-old brother, and stepfather of Elzey's fiancée lived in the upstairs portion of the bi-level. There is no dispute that the altercation in question began when the fiancée's stepfather chided the fiancée's brother

about leaving dirty dishes in the kitchen sink. There is also no dispute that Elzey came upstairs into the kitchen and told his fiancée's stepfather that he was not in charge and could not tell his fiancée's brother what to do. From that point, the parties' version of events is different.

{¶ 5} The fiancée's mother and stepfather testified that during the confrontation in the kitchen, Elzey became hostile after the stepfather told him that he was getting evicted from the residence. They testified that Elzey left the kitchen after the eviction comment, went downstairs, and then came back upstairs with a baseball bat and a box cutter. During that time, Elzey's fiancée and her mother attempted to stop Elzey as he charged up the stairs. According to the mother and stepfather, Elzey pushed through his fiancée and her mother, which caused the mother to hit the wall and injure her back. They also testified that Elzey yelled and cussed at the stepfather and told him that he would kill him and that he had killed people in the past. In addition, the stepfather testified that Elzey called him a racial slur and continued to tell him over a dozen times that he would kill him.

{¶ 6} The stepfather explained that when he saw that Elzey had a baseball bat and a box cutter, he and his wife retreated to their bedroom. Shortly thereafter, some other family members of Elzey's fiancée arrived at the residence and diffused the situation. The fiancée's great-grandmother, who is the matriarch of the family, spoke with the parties and confirmed that Elzey would leave the residence the following day. Since Elzey was planning on leaving, the fiancée's great-grandmother suggested that the fiancée's mother and stepfather not report the incident to the police. However, when Elzey failed to leave the residence, the fiancée's mother and stepfather called the police six days after the incident and had Elzey arrested for the charged offenses.

4

{¶ 7} According to the accounts provided by the defense, Elzey and his fiancée's stepfather were mutually exchanging threats of violence to one another, and Elzey grabbed the baseball bat and box cutter to protect his fiancée. Elzey testified that he had tried to have a conversation with his fiancée's stepfather about how he was treating his stepson, and the stepfather had responded by telling him to "get the fuck out of my face before I slip your shit." Trial Tr. 285 ("Tr."). Elzey indicated that he was upset with how his fiancée's stepfather had talked to him but nevertheless walked away from the situation and went outside to cool off. Elzey claimed that while he was outside, he heard the stepfather yelling loudly and aggressively at his fiancée, which caused him to fear for her life. Elzey thereafter admitted that he had retrieved a baseball bat and a box cutter and had told the stepfather that if he touched his fiancée, he would kill him.

{¶ 8} In light of the testimony presented at trial, the trial court instructed the jury on menacing as a lesser-included offense of aggravated menacing and self-defense. The jury found Elzy not guilty of assault, but guilty of aggravated menacing in violation of R.C. 2903.21(A). The jury also found that Elzy had not acted in self-defense during the aggravated menacing offense. Following the verdict, the trial court scheduled a sentencing hearing for February 24, 2025.

{¶ 9} During the sentencing hearing, the trial court provided Elzey with a Russian interpreter to help him give a mitigating statement before the trial court imposed its sentence. Elzey, however, refused to use the interpreter and told the court in English that he had nothing to say. Despite the trial court asking Elzey to use the interpreter to answer the court's questions, Elzey continued to answer questions in English. Elzey initially told the trial court that he was "very, very rusty" at Russian and then later claimed that he did not speak Russian. Sentencing Tr. 4. After considering various aspects of Elzey's background,

5

including that he was born in Russia, was drafted into the Russian military, and lived in Russia until he was 14 years old, the trial court indicated that it believed Elzey was deceiving the court about his inability to speak Russian.

{¶ 10} When imposing Elzey's sentence, the trial court considered Elzey's dishonesty, his past drug use, and the violent circumstances of the case. Based on those considerations, the trial court found that there was a substantial risk that Elzey would be a danger to others. The trial court also found the Elzey had committed one of the worst forms of the aggravated menacing offense. In light of these considerations, the trial court imposed the maximum possible sentence of 180 days in jail and a $500 fine.

{¶ 11} Elzey now appeals from his conviction, raising four assignments of error for review.

**First Assignment of Error**

{¶ 12} Under his first assignment of error, Elzey claims that his conviction for aggravated menacing was not supported by sufficient evidence and was against the manifest weight of the evidence.

*Standards of Review*

{¶ 13} "When a defendant challenges the sufficiency of the evidence, [he] is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law." *State v. Matthews*, 2018-Ohio-2424, ¶ 7 (2d Dist.), citing *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any

6

rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jenks* at 273.

{¶ 14} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagle*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*Aggravated Menacing Law and Analysis*

{¶ 15} As previously discussed, Elzey was convicted of aggravated menacing in violation of R.C. 2903.21(A). This statute provides, in relevant part, that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . ." R.C. 2903.21(A). Therefore, "[t]o establish a violation of R.C. 2903.21, 'the State must prove, beyond a reasonable doubt, that the offender (1) knowingly, (2) caused another to believe, (3) that the offender will cause serious

physical harm to the person or property of such other person . . . .'" *State v. Ranta*, 2024-Ohio-3213, ¶ 9 (2d Dist.), quoting *Dayton v. Gitwein*, 1990 WL 157171, *2 (2d Dist. Oct. 11, 1990).

{¶ 16} "Knowingly" is defined by R.C. 2901.22(B), which states that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 17} "Serious physical harm" is defined by R.C. 2901.01(A)(5) to include:

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 18} "The elements of aggravated menacing require a threat to the person, property, or family of another, coupled with the victim's belief in, and fear resulting from, the threat." *State v. Marcum*, 2011-Ohio-6140, ¶ 37 (7th Dist.). "While the victim's subjective belief is an element of aggravated menacing, neither the reasonability of that belief nor the actual ability of the accused to carry out the threat are necessary to establish the elements of the offense." *Id.*, citing *Dayton v. Dunnigan*, 103 Ohio App.3d 67, 71 (2d Dist. 1995); *accord State v. Newland*, 2002-Ohio-5132, ¶ 12 (2d Dist.).

8

**{¶ 19}** In this case, Elzey does not dispute that he grabbed a baseball bat and a box cutter and threatened to kill his fiancée's stepfather during their altercation. There is no doubt that killing someone would amount to serious physical harm as defined by R.C. 2901.01(A)(5); accordingly, that element of aggravated menacing was satisfied by Elzey's own testimony. Elzey, however, claims that the evidence failed to establish that his threatening language caused his fiancée's stepfather to believe that he would kill or inflict serious physical harm. Elzey argues that his threat to kill the stepfather was conditioned on the stepfather touching his fiancée. According to Elzey, such a conditional threat could not have caused the stepfather to fear imminent, serious physical harm.

**{¶ 20}** Elzey's argument fails for multiple reasons. First, there is evidence in the record indicating that Elzey's threat was not conditional. The State's witnesses testified that Elzey had simply threatened to kill the stepfather multiple times without any underlying condition. Second, even if Elzey's threat had not been conditional, it is well established that "'[a] conditional threat can constitute a violation of the menacing laws.'" *State v. Stutz*, 2020-Ohio-6959, ¶ 10 (2d Dist.), citing *State v. Collie*, 108 Ohio App.3d 580, 582 (1st Dist.1996); *City of Columbus v. James*, 1988 WL 96240, *4 (10th Dist. Sept. 15, 1988) ("[a] conditional threat, such as 'if you come in, I'll kick your ass,' is nonetheless a threat prohibited by the menacing laws"). Indeed, "[t]he crime of menacing can encompass a present state of fear of bodily harm *and a fear of bodily harm in the future*." (Emphasis added.) *State v. Rankin* 2014-Ohio-3104, ¶ 28 (5th Dist.), citing *Village of West Lafayette v. Deeds*, 1996 WL 752778 (5th Dist. Oct. 23, 1996). Therefore, the fact that Elzey's threat to kill the stepfather was allegedly conditioned on future conduct by the stepfather does not prevent that threat from satisfying the subjective-belief element of aggravated menacing.

9

**{¶ 21}** Elzey also argues that the subjective-belief element of aggravated menacing was not proven because the evidence established that his fiancée's stepfather had continued to live in the same residence with him after the threat was made and had not called the police until six days after the altercation. The record reveals that the stepfather did not immediately call the police because he had been told that Elzey would leave the residence the following day. The stepfather testified that when Elzey did not leave the residence as planned, he could not sleep at night due to Elzey's threats and that he was fearful for his family. The stepfather also testified that he had been worried that Elzey would "come in my bedroom cut me or I could come out the door and he would beat me with a baseball bat." Tr. 88. The stepfather explained that he had not wanted to throw his wife's daughter and Elzey out on the street, but he could no longer stay in the house with Elzey and eventually decided to call the police to get him to leave. Contrary to Elzey's claim otherwise, this scenario does not suggest that the stepfather was not in fear of serious physical harm by Elzey.

**{¶ 22}** Elzey next argues that the following portion of the stepfather's trial testimony suggests that he did not actually believe that he was in danger of serious physical harm:

> I was very, I was frightened at first, but as I seen I could tell it was, he was really trying to scare me. I don't think he really had the guts to cut me, but I was very fearful for my family at the home because he did have a box cutter and a baseball bat in his hand and he could have slipped, and fell and cut my wife, my stepdaughter. He really could have cut me with a baseball bat and that's why I moved, went to the bedroom because I know I can't beat a baseball bat and a box cutter.

Tr. 85.

{¶ 23} Although it is arguable that the foregoing testimony indicates that the stepfather had believed Elzey was just trying to scare him and not hurt him, we find it significant that the stepfather testified that he had been very "frightened at first," meaning that he was indeed frightened when Elzey initially appeared with the baseball bat and box cutter. The foregoing testimony also indicates that the stepfather had retreated into his bedroom because he feared that Elzey could have injured him. Elzey similarly fails to account for the stepfather's testimony expressing his belief that Elzey was going to cause him serious physical harm. For example, the stepfather stated on direct examination:

Q:     If you remember, how many times did [Elzey] threaten to kill you?

A:     It, at least 10 to 12. I don't know, 7, 8. Over the dozen mark.

Q:     And when he is doing this, he's holding box cutter and a baseball bat?

A:     Well the first time he said it, he . . . didn't have them items when he said he'd kill me the first time. I'd bet probably the second or third time, but when he come back upstairs is when he had the box cutter knife he was screaming he'd kill me[.]

Q:     And at that point, you believe him?

A:     Yeah . . . .

Tr. 90.

{¶ 24} The stepfather specifically testified that he "was very fearful" that Elzey would have inflicted "physical damage" to him with the baseball bat. Tr. 85-86. It has been recognized that "[a] baseball bat is certainly capable of inflicting death when used as a weapon." *State v. Price*, 1993 WL 127068, *3 (8th Dist. Apr. 22, 1993). The stepfather added that he was concerned that the box cutter also could have caused him and his family physical harm. Tr. 86.

11

{¶ 25} When viewing the foregoing testimony in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that Elzey knowingly caused the stepfather to believe that Elzey would cause him serious physical harm. As a result, we find that there was evidence supporting all essential elements of aggravated menacing and that Elzey's conviction was supported sufficient evidence.

{¶ 26} We also find that Elzey's conviction was not against the manifest weight of the evidence. After reviewing the entire record, weighing all the evidence and reasonable inferences, and considering witness credibility, we do not find that the trial court lost its way and created a manifest miscarriage of justice by finding Elzey guilty of aggravated menacing. The jury was free to credit any portion of the trial testimony, *State v. Lewis*, 2024-Ohio-756, ¶ 12 (2d Dist.), and it apparently chose to credit the stepfather's testimony indicating that Elzey's threats had caused him to fear serious physical harm at the hands of Elzey. Simply because the jury believed the stepfather's testimony does not mean that Elzey's conviction was against the manifest weight of the evidence. This case does not present any exceptional circumstance warranting reversal of Elzey's conviction on manifest weight grounds.

{¶ 27} Elzey's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 28} Under his second assignment of error, Elzey claims that his aggravated menacing conviction should be reversed because the State failed to disclose material impeachment evidence in violation of *Brady* and Crim.R. 16. According to Elzey, the State failed to disclose the full criminal history of his fiancée's stepfather, and this failure violated his right to due process.

12

*Brady Law and Analysis*

{¶ 29} "In *Brady*, 373 U.S. 83, the United States Supreme Court held that a state violates the Due Process Clause of the Fourteenth Amendment by suppressing evidence favorable to the accused where the evidence is material to guilt or punishment." *State v. Armstrong*, 2025-Ohio-2609, ¶ 24 (2d Dist.), citing *Brady* at 87. "To establish a *Brady* violation, a defendant must demonstrate (1) that the evidence is favorable to the defendant, because it is either exculpatory or impeaching, (2) that the evidence was willfully or inadvertently suppressed by the state, and (3) that the defendant was prejudiced as a result." *State v. Brown*, 2024-Ohio-749, ¶ 30, citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶ 30} Material impeachment evidence bearing on the credibility of the State's witnesses falls within the *Brady* rule. *State v. Glover*, 2016-Ohio-2833, ¶ 41 (8th Dist.). The United States Supreme Court has explained that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the general rule enunciated in *Brady*.]" *Giglio v. United States*, 405 U.S. 150, 154 (1972), quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

{¶ 31} The rule in *Brady*, however, "'only applies to evidence unknown to the defendant at the time of the trial.'" *State v. Hazel*, 2019-Ohio-2248, ¶ 29 (2d Dist.), quoting *State v. Royster*, 2015-Ohio-625, ¶ 17 (2d Dist.). "*Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence." *State v. Iacona*, 93 Ohio St.3d 83, 100 (2001), citing *State v. Wickline*, 50 Ohio St.3d 114, 116 (1990); *accord Brown* at ¶ 61 (Brunner, J., concurring). "In such a circumstance a trial court has authority, pursuant to Crim.R. 16[(L)(1)], to grant a continuance or make other orders that the court deems just to ensure that the recently

13

disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded." *Iacona* at 100. "'No due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial.'" *Id*., quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985).

{¶ 32} In this case, the cross-examination of the stepfather revealed that he had one out-of-state conviction for a crime of dishonesty, grand larceny. Following the stepfather's testimony and a recess of the trial, Elzey's counsel discovered that the stepfather had committed additional out-of-state felonies that involved crimes of dishonesty. Elzey's defense counsel brought the State's failure to disclose the additional felonies to the trial court's attention. The State responded that it had access to only Ohio criminal records, which excluded the stepfather's out-of-state offenses. Although the trial court found that the State should have disclosed the felonies, it found that the State's failure to do so was not a product of misconduct or bad faith. As a result, the trial court had the State recall the stepfather as a witness to testify about the additional felonies and to allow Elzey's trial counsel to cross-examine the stepfather about the additional convictions.

{¶ 33} The parties do not dispute that the stepfather's out-of-state felonies constituted *Brady* material. However, as previously discussed, "there is no *Brady* violation where evidence is disclosed or introduced during trial." *State v. Smith*, 2024-Ohio-5833, ¶ 9 (1st Dist.), citing *State v. Collins*, 2020-Ohio-4136, ¶ 14 (8th Dist.). A delayed disclosure of *Brady* material "'only violates *Brady* when the delay itself causes prejudice.'" *State v. Osie*, 2014-Ohio-2966, ¶ 155, quoting *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), *vacated and remanded on other grounds sub nom. Mohwish v. United States*, 507 U.S. 956 (1993).

14

{¶ 34} Elzey asserts that the delayed disclosure of the additional felonies prejudiced him because it denied him a meaningful opportunity to prepare and execute a complete impeachment of the stepfather. Our review of the record establishes otherwise. The record establishes that Elzey's trial counsel thoroughly questioned the stepfather about each of the felonies at issue. Counsel cross-examined the stepfather about his grand larceny conviction during his initial testimony. Upon the delayed disclosure of the stepfather's additional convictions, he was recalled as a witness. Elzey's trial counsel then had the stepfather confirm that he had pled guilty to the additional felonies, i.e., forgery, burglary, and breach of trust. Elzey's trial counsel also questioned the stepfather about why he had failed to mention those felonies when he first testified about his prior crimes of dishonesty. Given that Elzey's trial counsel was able to fully cross-examine the stepfather about his felonies, we fail to see how Elzey was prejudiced by the delayed disclosure.

{¶ 35} Because the stepfather's felonies were discovered during trial and because Elzey's trial counsel was given the opportunity to fully cross-examine the stepfather about those felonies, there was no due process violation as contemplated by *Brady*.

*Crim.R. 16 Law and Analysis*

{¶ 36} Elzey also tangentially argues that the delayed disclosure of the additional felonies violated Crim.R. 16. "Crim.R. 16 governs the discovery process and delineates information subject to disclosure and information not subject to disclosure, and it sets forth the proper time period for motions for discovery." *State v. Cleaver*, 2007-Ohio-5977, ¶ 24 (2d Dist.). As relevant to this case, Crim.R. 16(B)(2) provides that upon receipt of a written demand for discovery by a defendant, the State shall provide the "[c]riminal records of the defendant, a co-defendant, and the record of prior convictions that could be admissible

15

under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal."

{¶ 37} If a party fails to comply with the disclosure requirements of Crim.R. 16, the trial court has the discretion to "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1). Accordingly, "[t]he trial court's response to an alleged discovery violation under Crim.R. 16 is reviewed for an abuse of discretion." *State v. Miller*, 2023-Ohio-2508, ¶ 41 (2d Dist.), citing *State v. Parson*, 6 Ohio St.3d 442, 445 (1983). "An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process." *State v. McHenry*, 2021-Ohio-3118, ¶ 16 (2d Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 38} Upon review, we find that it was reasonable and not an abuse of discretion for the trial court to have the State recall the stepfather as a witness to have him testify regarding the additional felonies and to allow Elzey's counsel to cross-examine him on that matter. Elzey's defense counsel never objected to how the trial court responded to the delayed disclosure of the additional felonies in this case, and Elzey does not argue on appeal that the trial court's response to the delayed disclosure was an abuse of discretion.

{¶ 39} We also note that that "[t]his court has explained that the failure to provide evidence in discovery is not a per se denial of the right to due process because 'there must be evidence of some prejudice to the defendant.'" *Miller* at ¶ 38, quoting *State v. Long*, 2011-Ohio-4293, ¶ 21 (2d Dist.); *accord State v. Wilcoxson*, 2021-Ohio-4339, ¶ 38 (2d Dist.). As previously discussed, there was no prejudice in this case because Elzey's trial counsel

16

eventually learned of the stepfather's additional felonies and was able to fully cross-examine and impeach the stepfather on that matter.

{¶ 40} Elzey's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 41} Under Elzey's third assignment of error, he claims that his sentence should be vacated because his right to allocution was impaired by the trial court forcing him to use a Russian interpreter at the sentencing hearing even though he indicated that he was no longer proficient at speaking Russian. Elzey also claims that his sentence should be vacated because the trial court violated his right to due process by imposing the maximum sentence based on an improper inference of dishonesty that the trial court made after Elzey indicated that he does not speak Russian.

*Allocution Law and Analysis*

{¶ 42} We first address Elzey's claim that the trial court violated his right to allocution. Allocution is "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." *Black's Law Dictionary* (12th Ed. 2024). In Ohio, an absolute right of allocution is conferred by Crim.R. 32(A)(1). *State v. Green*, 90 Ohio St.3d 352, 358 (2000). Crim.R. 32(A)(1) provides that: "At the time of imposing sentence, the court shall . . . [a]fford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." Crim.R. 32(A)(1). "'A trial court complies with a defendant's right to allocution when it personally addresses the defendant and asks whether he or she has anything to

17

say.'" *State v. Allison*, 2025-Ohio-484, ¶ 12 (2d Dist.), quoting *State v. Champeau*, 2024-Ohio-4602, ¶ 11 (2d Dist.); *Osie*, 2014-Ohio-2966 at ¶ 180.

{¶ 43} It is well established that "[a] defendant may decline to exercise his or her right to allocution." *Champeau* at ¶ 14, citing *State v. Shepherd*, 2021-Ohio-4230, ¶ 24 (2d Dist.). "However, 'Crim.R. 32(A)(1) imposes an affirmative duty on the court to speak directly to the defendant on the record and inquire whether he or she wishes to exercise that right or waive it.'" *Id.*, quoting *State v. Sexton*, 2005-Ohio-449, ¶ 31 (2d Dist.). "[I]f the trial court imposes sentence without affording the defendant an opportunity to allocate, resentencing is required unless the error was invited or harmless." *Id.* at ¶ 12, citing *State v. Beasley*, 2018-Ohio-493, ¶ 200.

{¶ 44} In this case, the record reflects that the trial court personally addressed Elzey at his sentencing hearing and asked Elzey whether he had anything he wanted to say prior to his sentence being imposed. Before doing so, the trial court explained that although Elzey was able to speak English, the court "wanted him to have the opportunity to also have [the sentencing] proceeding in Russian." Sentencing Tr. 3. The trial court told Elzey that he had "an opportunity and a right to address the Court" and that he could tell the court anything that might be in his favor or that might give further insight into his situation. *Id.* The trial court thereafter told Elzey: "I will have you answer in Russian." *Id.* The Russian interpreter relayed the trial court's statements to Elzey, but Elzey responded in English and said: "I have nothing I want to say." *Id.*

{¶ 45} The trial court asked Elzey to "describe [his] situation with cocaine" and instructed him to answer in Russian. Sentencing Tr. 3-4. Elzey responded in English, "I'm very, very rusty at it." *Id.* at 4. The trial court asked Elzey to describe in Russian what

18

happened, and he responded in English that he had "nothing to say." *Id*. The trial court asked Elzey if he spoke Russian and Elzey indicated that he did not.

{¶ 46} Following that exchange, the trial court once again advised Elzey that he had "an opportunity and right to address the Court and tell [the court] anything that . . . might be in [his] favor" or "give [the court] a further insight into this situation." Sentencing Tr. at 5. The trial court asked Elzey a second time if there was anything he'd like to tell the court but did not instruct Elzey to answer in Russian. Elzey answered "no" in English. *Id*.

{¶ 47} Upon review, we fail to see how Elzey's right to allocution was impaired by the trial court offering him the assistance of a Russian interpreter and by initially asking him to speak in Russian. The record establishes that the trial court personally addressed Elzey and asked Elzey whether he wanted to say anything before sentencing. Elzey declined to make a statement in either Russian or English. Because the record establishes that the trial court personally addressed Elzey and afforded Elzey the opportunity to give a mitigating statement before sentencing, Elzey's allocution argument lacks merit.

*Sentencing Law and Analysis*

{¶ 48} Elzey also asks this court to vacate his sentence on due process grounds. He claims the trial court imposed the maximum sentence based on an improper assumption of dishonesty that the trial court made after he failed to speak Russian at his sentencing hearing. Although his argument is framed as a constitutional violation, we find that Elzey is simply challenging the trial court's decision to impose the maximum sentence for his offense.

{¶ 49} "Appellate courts review misdemeanor sentences for an abuse of discretion." *State v. Scott*, 2023-Ohio-476, ¶ 7 (2d Dist.). When imposing a sentence for a misdemeanor offense, a trial court must consider the purposes and principles of misdemeanor sentencing set forth in R.C. 2929.21, as well as the sentencing factors set forth in R.C. 2929.22. *Id*. at

¶ 8-9. There are seven factors listed under R.C. 2929.22(B)(1) that the trial court must consider. *Id*. at ¶ 9. "'Stated generally, those factors include the nature and circumstances of the offense(s); whether the offender has a history of persistent criminal activity and is likely to commit another offense; whether there is a substantial risk that the offender will be a danger to others; whether the victim's circumstances made the victim particularly vulnerable to the offense or made the impact of the offense more serious; and factors relating to the offender's military service, if any.'" *Id*., quoting *State v. Johnson*, 2022-Ohio-1782, ¶ 11 (2d Dist.). The court may consider "any other factors that are relevant to achieving the purposes and principles of sentencing set forth in [R.C. 2929.21]." R.C. 2929.22(B)(3). In addition, the court must consider "any relevant oral or written statement made by the victim, the defendant, the defense attorney, or the prosecuting authority regarding sentencing for a misdemeanor." R.C. 2929.22(D)(1).

{¶ 50} As relevant to this case, R.C. 2929.22(C) provides that "[a] court may impose the longest jail term authorized under section 2929.24 of the Revised Code only upon offenders who commit the worst forms of the offense or upon offenders whose conduct and response to prior sanctions for prior offenses demonstrate that the imposition of the longest jail term is necessary to deter the offender from committing a future criminal offense." R.C. 2929.22(C). "'The phrase "worst forms of the offense" is not defined by statute and it is left primarily to the trial court's discretion to determine its meaning.'" *Scott* at ¶ 13, quoting *State v. Huff*, 2000 WL 1741901, *5 (7th Dist. Nov. 20, 2000). It has been recognized that the phrase "worst forms of the offense" includes "'many conceivable forms, because the plural "forms" contemplates "not just a single form of any offense that is the worst, but that more than one situation may be one of the worst forms of the offense."'" *Id*., quoting *State*

*v. Mushrush*, 135 Ohio App.3d 99, 110 (1st Dist. 1999), quoting *State v. Patterson*, 1998 WL 720733, *4 (4th Dist. Sept. 21, 1998).

**{¶ 51}** "Although R.C. 2929.22(C) identifies the circumstances under which a maximum sentence is permissible, it does not require the trial court to make any explicit findings." *Scott* at ¶ 10. "Indeed, the trial court is not required to make findings on the record with regard to any of the sentencing considerations under R.C. 2929.22." *Id*. "'When a misdemeanor sentence is imposed within the statutory limits, reviewing courts will presume that the trial court considered the factors set forth in R.C. 2929.22 absent an affirmative showing to the contrary.'" *Id*., quoting *State v. Horr*, 2022-Ohio-3160, ¶ 7 (2d Dist.). "[A]n appellate court will find an abuse of discretion where it is clear that a maximum sentence was imposed for reasons outside the appropriate statutory considerations." *State v. Dawes*, 2025-Ohio-2576, ¶ 12 (6th Dist.).

**{¶ 52}** In this case, the trial court reviewed Elzey's presentence investigation ("PSI"), which indicated that 21-year-old Elzey was born and raised in Russia and was taught to speak some English by his relatives. The trial court found that Elzey had reported to the PSI examiner that he had been drafted into the Russian military two days after his 14th birthday during the buildup of the Ukraine War but then had fled to Hungary where he survived on the streets with homeless individuals. The trial court noted that Elzey had reported saving enough money to purchase an airline ticket to the United States just before he turned 16 years old. When Elzey arrived at the airport in New York, he was immediately taken into custody by child protective services.

**{¶ 53}** Given the foregoing background information about Elzey, when he told the trial court that he did not speak Russian at his sentencing hearing, the trial court indicated that it believed Elzey was deceiving the court. The trial court also suggested that if Elzey could not

21

speak Russian, he had committed perjury when he testified about his Russian background during his trial.

{¶ 54} After discussing Elzey's dishonesty, the trial court heard statements from the State, which indicated that Elzey had been a negative influence on his fiancée's 16-year-old brother. The State asserted that Elzey had taught the brother to hate and become belligerent and rebellious toward adult authority. The trial court further considered information in the PSI indicating that Elzey had a history of using cocaine and that he had attempted suicide when he was 17 years old. The trial court also factored in the circumstances underlying the aggravated menacing offense. Noting how Elzey had grabbed a box cutter and a baseball bat and threatened to kill his fiancée's stepfather in response to the stepfather reasonably chiding his stepson about leaving dirty dishes in the sink, the court concluded that Elzey had committed one of the worst forms of aggravated menacing. The trial court reasoned that the only way Elzey's offense could have been more serious was if he had threatened the stepfather with a gun. Considering the foregoing circumstances and the deception that Elzey displayed at his sentencing hearing, the court found that Elzey presented a substantial risk of danger to others. Based on all these considerations, the trial court imposed the maximum sentence of 180 days in jail and a $500 fine.

{¶ 55} We find that the trial court imposed the maximum sentence based on appropriate statutory considerations. Given the record, the trial court's perception that Elzey had deceived the court when claiming that he did not speak Russian was reasonable. It was also not the only factor that the trial court considered when deciding to impose the maximum sentence. The trial court considered the nature and circumstances of Elzey's offense and reasonably determined that he had committed one of the worst forms of aggravated menacing. The trial court reasonably concluded that Elzey posed a substantial risk of danger

to others. Because the trial court's findings were reasonable and based on appropriate statutory considerations, the court did not abuse its discretion by imposing the maximum sentence for Elzey's aggravated menacing offense.

{¶ 56} Elzey's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 57} Under his fourth assignment of error, Elzey challenges the trial court's decision to have his sole defense witness, his fiancée, testify by writing her answers to counsel's questions at trial and having her answers read to the jury by an unsworn court bailiff. According to Elzey, this procedure violated R.C. 2311.14, Evid.R. 604, Crim.R. 22, and his constitutional right to confrontation. Elzey also argues that his trial counsel provided ineffective assistance by agreeing to this procedure.

{¶ 58} As a preliminary matter, the record establishes that both the jury and the trial court had difficulty understanding what Elzey's fiancée was saying while she was testifying. The record does not indicate that Elzey's fiancée had any kind of mental or physical disability. It simply reveals that her manner of speaking was difficult to understand. To remedy the issue, the trial court gave Elzey's fiancée a pen and a legal pad and had her write her answers to counsel's questions for the court bailiff to read to the jury. After some discussion, both parties agreed to this procedure. Elzey's trial counsel specifically stated on the record that having Elzey's fiancée write down her answers and read into the record by the court bailiff was probably the best possible solution under the circumstances.

{¶ 59} Because Elzey did not object at trial to the method his fiancée's testimony was presented to the jury, his arguments challenging the procedure may be reviewed only for plain error. "Plain error requires the existence of an obvious error and a reasonable probability that it affected the outcome of the proceeding." *State v. Smith*, 2025-Ohio-2086,

23

¶ 47 (2d Dist.), citing *State v. Hess*, 2023-Ohio-3658, ¶ 11 (2d Dist.). Courts are "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 60} We first address Elzey's argument that the questioning procedure at issue violated R.C. 2311.14 and Evid.R. 604. Under R.C. 2311.14(A), "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." R.C. 2311.14(B) provides that "[b]efore entering upon official duties, the interpreter shall take an oath that the interpreter will make a true interpretation of the proceedings to the party or witness, and that the interpreter will truly repeat the statements made by such party or witness to the court, to the best of the interpreter's ability." Evid.R. 604 contains a parallel requirement, which subjects interpreters to "the administration of an oath or affirmation to make a true translation."

{¶ 61} In relying on these authorities, Elzey suggests that the trial court should have appointed a sworn interpreter as opposed to having an unsworn court bailiff read the written testimony of Elzey's fiancée to the jury. But an interpreter was never requested in this case. And "[i]n the absence of a request by a party or witness, R.C. 2311.14 requires the trial court to appoint a[n] . . . interpreter *only if a party cannot readily understand or communicate in English*." (Emphasis added.) *State v. G.C.*, 2016-Ohio-717, ¶ 21 (10th Dist.), citing *State v. Castro*, 1995 WL 558782 (2d Dist. 1995). The decision whether to appoint an interpreter lies within the sound discretion of the trial court. *Matter of M.A.*, 2021-Ohio-1078, ¶ 20 (10th Dist.); *Luna-Corona v. Esquivel-Parrales*, 2009-Ohio-2628, ¶ 11 (12th Dist.); *State v. Marquez*, 2008-Ohio-5324, ¶ 30 (11th Dist.).

{¶ 62} The record establishes that Elzey's fiancée spoke and understood English and could readily communicate in English through writing. Because Elzey could understand and communicate in English, the trial court was not required to appoint an interpreter under R.C. 2311.14. Elzey has not identified any obvious error in the trial court's chosen questioning procedure. Even if there had been an obvious error, Elzey cannot establish that the outcome of his trial would have been different had the trial court appointed an interpreter. Elzey does not claim that the nature of his fiancée's testimony would have been any different had it been presented through an interpreter. Her testimony corroborated Elzey's version of events. Elzey has not established plain error.

{¶ 63} To the extent that Elzey objects to the court bailiff relaying his fiancée's testimony in the absence of an oath regarding the bailiff's "neutrality and fidelity to the original writing," both counsel had the opportunity to review the fiancée's written answers before the bailiff read them to the jury. Elzey's trial counsel could have objected if the court bailiff had not read his fiancée's written answers word for word. Because there was no such objection, we may presume that the court bailiff correctly read the fiancée's answers and maintained neutrality and fidelity to what was written. Any error in failing to swear in the court bailiff before he read the fiancée's answers did not prejudice Elzey. Both parties could have objected to any discrepancies between the written answers and those relayed by the bailiff.

{¶ 64} Elzey also argues that the procedure used for questioning his fiancée violated Crim.R. 22 because his fiancée's written answers were never marked as trial exhibits and recorded and preserved for appellate review. Crim.R. 22 provides that "[i]n petty offense cases . . . if requested by any party all proceedings shall be recorded." Crim.R. 22. Therefore, "a petty offense case need not be recorded unless requested by a party to the proceedings." *State v. Chapple*, 1993 WL 156181, *3 (12th Dist. 1993). A "petty offense" is "a misdemeanor

25

other than a serious offense." Crim.R. 2(D). A "serious offense" is "any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R. 2(C).

{¶ 65} Elzey's aggravated menacing offense is a first-degree misdemeanor for which the penalty prescribed by law does not include confinement for more than six months. *See* R.C. 2903.21(A); 2929.24(A)(1). Elzey committed a "petty offense," so a recording of the proceedings was not required unless it was requested by a party. In this case, there is nothing in the record indicating whether either party requested a recording of the proceedings. If no recording was requested, then no recording was required under Crim.R. 22. Here the trial court did record the proceedings in this case, as there is a transcript of the proceedings. The transcript establishes that although the fiancée's written answers to counsel's questions were not marked and admitted as trial exhibits, they were read into the record by the court bailiff and appear in the transcript. Therefore, even if we were to assume that a recording of the proceedings was required under Crim.R. 22, we find no error, let alone plain error given that the fiancée's written answers were included in the record and preserved for appeal.[1]

{¶ 66} Elzey also argues that the procedure used to question his fiancée violated his constitutional right of confrontation. The constitutional right of confrontation guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const.,

---

[1] The record establishes that the last question posed to Elzey's fiancée was not recorded because the trial court's recording system malfunctioned. The trial court addressed that matter on the record and indicated that the unrecorded question had been objected to and that the objection had been sustained. This indicates that the unrecorded question was not answered by Elzey's fiancée, which means that Elzey suffered no prejudice by the question not appearing in the record. *See State v. Skaggs*, 53 Ohio St.2d 162 (1978), paragraph one of the syllabus ("The failure of a recording device to completely reproduce all of the proceedings of a trial in a petty offense case is not prejudicial per se.").

amend. VI. It is well established that the right of confrontation "is available for exercise only when adverse witnesses testify." *State v. Blakeman*, 2002 WL 857659, *3 (2d Dist. May 3, 2002); *State v. Brown*, 1991 WL 87179, *2 (5th Dist. May 13, 1991) ("[t]he right of confrontation is generally identified with a witness who testifies against the accused"); *Samia v. United States*, 599 U.S. 635, 644 (2023), ("the Confrontation Clause applies only to witnesses 'against the accused'"), quoting *Crawford v. Washington*, 541 U.S. 36, 50 (2004); *Chambers v. Mississippi*, 410 U.S. 284, 297-98 (1973) (the Confrontation Clause may also apply to a defense witness who testifies adversely to the defendant). Elzey's fiancée was not an adverse witness. Her testimony corroborated Elzey's version of events. Elzey's confrontation argument is misplaced and does not establish plain error.

{¶ 67} Lastly, Elsey argues that his trial counsel provided ineffective assistance by agreeing to the questioning procedure at issue. "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In other words, "the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id*., citing *Bradley* at paragraphs two and three of the syllabus. ""A reasonable probability is a probability sufficient to undermine confidence in the outcome."" *Id*., quoting *Bradley* at 142, quoting *Strickland* at 694.

{¶ 68} We find that the questioning procedure employed by the trial court was likely the best option for dealing with the jury's inability to understand the fiancée's manner of speaking. There is no indication that this procedure disadvantaged Elzey in any way. We

27

fail to see how counsel's agreement to that procedure fell below an objective standard of reasonable representation and find no deficient performance in that regard.

{¶ 69} We also fail to see how the outcome of the proceedings would have been different had Elzey's trial counsel objected to the questioning procedure at issue and requested an interpreter. Given that Elzey's fiancée could communicate in English, it is unlikely that the trial court would have granted a request for an interpreter, as it is unclear who would have been qualified to interpret the fiancée's manner of speaking. It is purely speculative whether the trial court would have granted a request for an interpreter, and such speculation cannot support an ineffective assistance claim. *State v. Short*, 2011-Ohio-3641, ¶ 119.

{¶ 70} Even if we were to assume that the trial court would have appointed an interpreter, there is no indication that the nature of the testimony given by Elzey's fiancée through an interpreter would have been different so as to impact the outcome of Elzey's trial. Therefore, we do not find that Elzey suffered any prejudice from his trial counsel's failure to object to the questioning procedure or counsel's failure to request an interpreter.

{¶ 71} Because Elzey cannot establish deficient performance of this trial counsel or any resulting prejudice, his ineffective assistance of counsel claim fails.

{¶ 72} Elzey's fourth assignment of error is overruled.

## Conclusion

{¶ 73} Having overruled all four assignments of error raised by Elzey, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, J., and HUFFMAN, J., concur.

28